(No. 85541.—

## PAUL R. ZIENCINA, Appellee, v. THE COUNTY OF COOK, A Municipal Corporation, Appellant.

*Opinion filed September 30, 1999.*

Richard A. Devine, State's Attorney, of Chicago (Patricia M. Shymanski, Sara Dillery Hynes, Kathleen F. Howlett and Allen Kirsh, Assistant State's Attorneys, of counsel), for appellant.

Hegarty & Heath, of Chicago (Terrence K. Hegarty and Timothy W. Heath, of counsel), for appellee.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the plaintiff, Paul R. Ziencina, was awarded $600,000 in damages in this personal injury action against the defendant, Cook County, for its negligence in clearing snow at a highway intersection. The appellate court affirmed that judgment in an unpublished order. No. 1—96—1212 (unpublished order under Supreme Court Rule 23). We allowed the defendant's petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now affirm the judgment of the appellate court.

The accident at issue occurred early in the morning on January 31, 1991. At that time, the plaintiff was driving north on Ridgeland Avenue near the city of Matteson when he stopped at the intersection of Ridgeland and Vollmer Road. The plaintiff intended to turn left onto Vollmer, an east-west route. A mound of snow on the southwest corner of the intersection blocked the plaintiff's view to the west, however, and the plaintiff's car was struck by a vehicle coming from the west on Vollmer as the plaintiff edged out into the intersection to get a better view of traffic. Both roads were two-lane highways with speed limits of 45 miles per hour; traffic on Ridgeland, but not on Vollmer, was required to stop at the intersection.

The plaintiff commenced the present action on July 9, 1991, by filing suit against Cook County, which maintained the intersection, and Terry Miller, the driver of the other vehicle. The plaintiff later settled with Miller, and that portion of the action is not involved in this appeal. The plaintiff's claim against the county alleged that the county was negligent in plowing snow into a large pile, which blocked the view of northbound traffic on Vollmer, and in failing to remove the snow after placing it there.

At trial, the plaintiff testified that on the morning of

the accident, January 31, 1991, he left home around 6:15 or 6:20 to go to work; he was driving a 1981 Toyota Corolla. The plaintiff drove north on Ridgeland toward Vollmer Road, stopped at the stop sign, and noticed a huge pile of snow on the southwest corner. The plaintiff intended to make a left turn. He looked right and left, but he could not see anything to the left because of the snowbank. The plaintiff edged forward to get a better view of eastbound traffic on Vollmer. He was at the edge of Vollmer but he still could not see, so he moved out a little more. He next remembered being hit by another vehicle. On cross-examination, the plaintiff testified that he went to work the day before the accident and drove through the intersection without incident.

Terry Miller, the driver of the vehicle that struck the plaintiff's car, testified by way of a videotaped evidence deposition. Miller stated that on January 31, 1991, he was driving to work around 6 a.m., traveling eastbound on Vollmer Road in a Chevrolet Blazer. That morning, Miller noticed a pile of snow at the southwest corner of the intersection of Vollmer and Ridgeland. The highest point of the mound was at the edge of the intersection, and the pile extended 30 to 40 feet south on Ridgeland. According to Miller, the snow stood higher than the roof of a car, and it appeared to have been created by plowing rather than by drifting.

Miller testified that he slowed down as he approached the intersection, so that he was going 30 to 40 miles per hour immediately before the collision. Miller said that he was 40 to 60 feet from the intersection when he noticed the front end of the plaintiff's car. The plaintiff then pulled forward slowly, and Miller hit the side of the plaintiff's car a second or two later.

Robert Thelen, a neighbor of the plaintiff, followed the plaintiff to the intersection of Vollmer and Ridgeland on the morning of the accident. At trial, Thelen testified

that there was snow piled on the southwest corner of the intersection that day, and he estimated that the pile stood about the height of two cars, or eight to nine feet. Thelen thought that the snow had been plowed there and was not the result of drifting. Thelen saw the plaintiff stop at the stop line on the pavement before the intersection. The plaintiff then moved forward slowly and stopped, and he repeated that pattern several times before he finally entered the intersection. The plaintiff was then hit by a vehicle traveling eastbound on Vollmer Road. Thelen, who was driving a pickup truck that morning, testified that the mound of snow prevented him from seeing eastbound traffic on Vollmer.

Voies Phillips, also a neighbor of the plaintiff, arrived at the intersection shortly after the plaintiff's accident. Phillips testified that he saw a huge pile of snow at the southwest corner of the intersection of Vollmer and Ridgeland. Phillips said that the snow stood five feet high and extended south of Vollmer for about 20 to 25 feet. Phillips believed that the snow had been plowed there and was not the result of drifting; he could see marks in the snow where the blade of the plow had cut into the pile, and on the roadway were trails of snow like those left by a plow. Phillips testified that when he tried to make a right turn at the intersection, he could not see the traffic approaching from the west on Vollmer because the snow blocked his view; he estimated that the pile stood about two or three feet higher than the roof of his car, a Chevrolet Caprice. Phillips later spoke with the plaintiff about the accident, and the plaintiff explained that he did not see the car that hit him because of the snow pile.

Detective Norman Bernsen of the Matteson police department was notified of the accident and arrived on the scene a little after 6:30 that morning. Detective Bernsen testified that he noticed a mound of snow at the

southwest corner of the intersection of Vollmer and Ridgeland, and he stated that the snow appeared to have been plowed there. According to the detective, the snow pile on the corner would have impaired the view of a driver traveling north on Ridgeland and looking to the west.

The parties also presented evidence concerning the defendant's snowplow operations. According to this testimony, county snowplow operators were instructed not to leave snow at intersections in such a manner that it could create a hazard by blocking a driver's view. Snowplow operators were also instructed to report problems, including blocked sight lines, and one snowplow driver stated that he would reduce the height of a pile of snow that stood five feet high. There was also testimony that drifting had been reported on Ridgeland Avenue south of Vollmer on January 31, 1991. A witness explained that there is a low spot on Ridgeland, about one-fourth to one-half mile south of Vollmer, where drifting can occur. The witness also stated that farm fields lie to the south and west of the intersection and that, with certain winds, snow can blow across the intersection. County employees who drove through the intersection on January 30 and 31 could not recall the condition of the southwest corner.

Wayne Peterson, a meteorologist employed by a private weather forecasting service, described weather conditions for the period preceding the plaintiff's accident. For this purpose, Peterson used data collected in Park Forest, which was the closest reporting station. According to this information, a trace amount of snow fell during the 24-hour period ending at 8 a.m. on January 30, and no snow fell during the same period ending January 31. There were three inches of snow already on the ground during those days.

Andrew Ramish testified as the plaintiff's expert wit-

ness. Ramish, a civil engineer, was president of the Institute for Safety Analysis and acted as that entity's director of highway engineering. Ramish examined the police reports, photographs, and depositions compiled in this case. He believed that county snowplow operators violated normal safety standards by placing snow in a way that could obstruct drivers' sight lines at the intersection, which created an unnaturally dangerous condition. In Ramish's opinion, the snowplow drivers should have pushed the snow back further, and they violated customary safety standards by failing to do so.

The plaintiff also introduced evidence about his injuries and medical expenses. Immediately after the accident, the plaintiff was taken to a hospital in Olympia Fields. Nine days later, he was transferred to Northwestern Memorial Hospital. After a month at Northwestern, he was transferred to the Rehabilitation Institute, where he stayed for three to four weeks to undergo a course of physical therapy. The plaintiff, who was employed as a mechanic for a trucking company, returned to work in June 1991 on a trial basis, and he resumed full-time employment in August of that year. The plaintiff testified that he cannot perform as many tasks at work now as he could before the accident, and he said that movement is painful and the weather affects him. He said that he is always in pain and that he takes an analgesic twice a day. The plaintiff was 45 years old at the time of trial, in 1995.

The plaintiff's wife, Maryann Ziencina, also testified at trial, describing the plaintiff's characteristics and condition before and after the accident. Mrs. Ziencina said that her husband now tires easily, is physically weaker than he was before the accident, and is not as active as he used to be. Mrs. Ziencina also stated that the plaintiff finds physical contact to be painful.

The jury also saw a videotape of an evidence deposi-

tion of the doctor who treated the plaintiff. Dr. Joan Boomsma saw the plaintiff shortly after he arrived at Northwestern. He was critically ill and was being intubated. In the accident, the plaintiff suffered a severe chest wall injury, resulting in multiple rib fractures, a flail chest, and bruising of the lungs, and he had air and blood in his chest cavity. Nine of the plaintiff's ribs were fractured, and at least five of those were broken in two places. Dr. Boomsma also stated that rib fractures like those suffered by the plaintiff can be very painful. Dr. Boomsma diagnosed the plaintiff as having adult respiratory distress syndrome, or ARDS, a severe form of lung injury. Dr. Boomsma estimated that more than half of the patients with ARDS do not survive.

Dr. Boomsma stated that she has not seen the plaintiff since he was discharged from Northwestern in March 1991. The deposition in which she was appearing was given in November 1995, shortly before trial began. She stated that it was conceivable that the plaintiff would continue to experience stiffness and discomfort on his injured side. Dr. Boomsma said that the plaintiff's ARDS had essentially resolved itself by the time of his discharge from the hospital. She also stated that patients who survive the condition have few residual problems with their lungs, which are essentially normal once recovery occurs.

The jury found the defendant liable and calculated the plaintiff's damages, both past and future, to be $1.2 million. Specifically, the jury found the plaintiff's medical bills to total $179,046.95, the amount stipulated to by the parties, and his pain and suffering to be $1,020,953.05. The jury did not award the plaintiff any damages for disability. The jury also found the plaintiff's own negligence to constitute 50% of the total fault and therefore awarded the plaintiff a net amount of $600,000 in damages.

The appellate court affirmed, in an unpublished order. No. 1—96—1212 (unpublished order under Supreme Court Rule 23). The appellate court rejected the defendant's various challenges to the circuit court judgment, including the arguments that the defendant was statutorily immune from liability for the plaintiff's accident and that the jury should not have awarded the plaintiff any damages for future pain and suffering. We allowed the defendant's petition for leave to appeal. 177 Ill. 2d R. 315(a).

Before this court, the defendant renews its contentions that it is statutorily immune from liability and that the award of damages for the plaintiff's future pain and suffering is not supported by the evidence, as well as several other challenges to the judgments below. We consider first the defendant's claim of immunity. Section 3—105(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) provides:

"Neither a local public entity nor a public employee is liable for an injury caused by the effect of weather conditions as such on the use of streets, highways, alleys, sidewalks or other public ways, or places, or the ways adjoining any of the foregoing, or the signals, signs, markings, traffic or pedestrian control devices, equipment or structures on or near any of the foregoing or the ways adjoining any of the foregoing. For the purpose of this section, the effect of weather conditions as such includes but is not limited to the effect of wind, rain, flood, hail, ice or snow but does not include physical damage to or deterioration of streets, highways, alleys, sidewalks, or other public ways or place or the ways adjoining any of the foregoing, or the signals, signs, markings, traffic or pedestrian control devices, equipment or structures on or near any of the foregoing or the ways adjoining any of the foregoing resulting from weather conditions." Ill. Rev. Stat. 1989, ch. 85, par. 3—105(a) (now codified at 745 ILCS 10/3—105(a) (West 1998)).

Also relevant to our consideration of this appeal are two other provisions of the Tort Immunity Act. Section

3—105(c) states, "Nothing in this Section shall relieve the local public entity of the duty to exercise ordinary care in the maintenance of its property as set forth in Section 3—102." Ill. Rev. Stat. 1989, ch. 85, par. 3—105(c) (now codified at 745 ILCS 10/3—105(c) (West 1998)). Section 3—102(a) provides:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." Ill. Rev. Stat. 1989, ch. 85, par. 3—102(a) (now codified at 745 ILCS 10/3—102(a) (West 1998)).

The defendant argues that section 3—105(a) immunizes it from liability in the instant case. The defendant construes section 3—105(a) broadly, as barring liability for the effects of weather conditions generally. The defendant thus maintains that section 3—105(a) provides absolute immunity for injuries caused by or attributable to snow-removal efforts. The defendant also argues, alternatively, that it may be held liable only for injuries caused by or attributable to unnatural accumulations of ice and snow, and that the snow pile involved in this case must be considered a natural accumulation.

Because of the relationship between section 3—105(a) and the natural accumulation rule, it may be helpful first to review the development of that doctrine in Illinois. Over the years, the rule has developed in this state, as it has in some other jurisdictions, that landowners—whether public or private—are not liable for the failure to remove natural accumulations of ice and snow on their property. In Illinois, the natural accumulation rule first

appeared in a decision of this court, *Graham v. City of Chicago*, 346 Ill. 638 (1931). In that case, the plaintiff slipped and fell on ice that had formed from water that had overflowed during the winter-time creation of an ice skating rink. The court concluded that a municipality should not be liable for the failure to remove naturally occurring ice and snow, but that liability was proper in that case because the ice resulted from an unnatural cause—the formation of the skating rink.

The natural accumulation rule precluded liability in *Riccitelli v. Sternfeld*, 1 Ill. 2d 133 (1953). The plaintiff in that case was injured when she slipped and fell on a piece of ice or snow that had formed from banks of snow placed near a sidewalk. The city had previously cleared the streets of snow, and a private landowner had then placed additional snow on the piles already deposited. The plaintiff argued that the private landowner had created an unnatural accumulation, like that recognized in *Graham*, by adding snow to the existing piles that lined the sidewalk. This court rejected the plaintiff's argument that the property owner's placement of additional snow on top of existing snowbanks created an artificial condition for which the defendant could be held liable. The court explained:

> "With this contention we cannot agree. The defendant displayed zeal in cleaning his walks. He also cleared the area about his place of business. Due to the character of the neighborhood in which both he and the plaintiff resided he had no place to carry the snow except on piles which had been created by the clearing of the walks. In so doing he did not place the snow on the sidewalk. Due to the vagaries of nature at that time of the year, alternate thawings and freezing caused snow to melt and run down on the walk where it again froze. Evidence indicates that when this happened the defendant placed rock salt on it in an effort to make the way safer for pedestrians including the plaintiff. Whether or not the snow which melted to form the ice on which plaintiff slipped came from snow which

had been shoveled off the walk or snow which had been removed from [defendant's] driveway no one can say. Suffice it to say, that to form the ice in question the snow had to melt and run from piles which had been banked during a snow-removal operation." *Riccitelli*, 1 Ill. 2d at 136-37. For these reasons, the court concluded that the defendant landowner was not liable for the plaintiff's fall.

A later decision of this court considered the relationship between the natural accumulation rule and section 3—105(a) of the Tort Immunity Act. In *Lansing v. County of McLean*, 69 Ill. 2d 562 (1978), the court disagreed with the plaintiff's contentions that the defendant county had a duty either to clear ice and snow from county roads or to post signs warning of the icy conditions, citing *Graham* and its progeny. The court believed that section 3—105(a) of the Tort Immunity Act "codified the preexisting judicially created rule of nonliability" for injuries caused by natural accumulations of ice and snow, and the court considered the unplowed ice and snow on which the plaintiff's car had skidded to be a natural accumulation. *Lansing*, 69 Ill. 2d at 572.

More recently, in a case factually similar to the present appeal, the appellate court considered the question of municipal liability for an automobile accident allegedly caused by an obstruction created through snow-removal efforts. In *Bellino v. Village of Lake in the Hills*, 166 Ill. App. 3d 702 (1988), the plaintiff's car was struck by another vehicle while the plaintiff was attempting to make a left turn at an intersection; the plaintiff alleged that his view of traffic on the other street was partially obstructed by a mound of snow that village employees had placed on the corner. The trial judge dismissed the complaint, concluding that the municipality was immune from liability under sections 3—102 and 3—105 of the Tort Immunity Act, and the appellate court affirmed. Citing this court's opinions in *Riccitelli* and *Lansing*, the appellate court characterized the snow pile in that case

as a natural accumulation, and the court therefore held that the defendant village was immune from liability under section 3—105(a) of the Act.

The appellate court reached the opposite conclusion in *Kiel v. City of Girard*, 274 Ill. App. 3d 821 (1995). In that case, the plaintiff was injured when she slipped and fell on a pile of snow, which municipal employees had shoveled from the street and sidewalk and placed on the curb. A jury found for the plaintiff. Declining to follow *Bellino*, the appellate court in *Kiel* concluded that the city was not immune from liability for its snow-removal efforts. The *Kiel* court nonetheless held that the jury's verdict was against the manifest weight of the evidence, finding that the testimony failed to show that the city had breached its duty of care. The court observed that the snow pile on which the plaintiff fell, though an unnatural accumulation, was small and easily visible.

We conclude that the mound of snow created by the defendant county's snow-removal efforts is properly considered an unnatural accumulation and that liability may be imposed against the defendant in these circumstances. This result, we believe, is consistent with the provisions of the Tort Immunity Act as well as with *Graham* and its progeny. It is clear that a local public entity has no duty to remove natural accumulations of ice and snow from public property. Ill. Rev. Stat. 1989, ch. 85, par. 3—105(a) (now codified at 745 ILCS 10/3—105(a) (West 1998)) (relieving local public entities of liability for injuries "caused by the effect of weather conditions as such"); *Lansing*, 69 Ill. 2d at 573 (recognizing that section 3—105(a) codifies the natural accumulation rule). At the same time, however, the immunity conferred by section 3—105(a) is made subject to the requirement found in sections 3—102 and 3—105(c) that local public entities exercise due care in the maintenance of their property. We believe that this latter requirement means

that, if a local public entity undertakes snow-removal operations, it must exercise due care in doing so.

Applying these principles to the case at bar, we agree with the plaintiff that the defendant county may be held liable for the plaintiff's accident. The evidence in this case showed that a large mound of snow, standing higher than the plaintiff's car, had been placed on the southwest corner of the intersection where the accident occurred. According to the testimony, the snow mound was high enough to obstruct the view of the plaintiff and other drivers who drove through the intersection that morning. Notably, the evidence also showed that the defendant's employees recognized the significant hazard posed by such obstructions and would, in the exercise of ordinary care, reduce the height of a snow mound like this one.

*Riccitelli*, cited by the defendant, is not to the contrary. The defendant contends that the court in that case held that snow piles are natural accumulations. In support of this interpretation, the defendant cites the following passage from the opinion, in which this court quoted the appellate court:

" 'The water which froze and produced the lump of ice on which plaintiff fell, came from natural causes. It cannot be said to have arisen from anything defendant did, other than removing the snow obstructing his driveway and making a path on the sidewalk for pedestrians. That in so doing he may have piled some snow from the driveway onto the piles banked along the walk is not the type of act upon which liability in a case of this character may be predicated.' " *Riccitelli*, 1 Ill. 2d at 137.

We do not agree with the defendant that the preceding quotation signifies that this court concluded in that case that piles of snow produced through snow-removal operations are necessarily natural accumulations. The cause of the accident in *Riccitelli* was not the snow piles themselves, but ice that had formed as a result of the natural process of melting and refreezing. The reference

to the defendant's placement of the snow merely explains the extent of the landowner's role in creating the piles, and how the snow happened to appear where it did. We do not construe the statement above as determining that piles of cleared snow are natural accumulations, for which liability may never arise.

Given our result in this case, it is necessary that we briefly address several other issues raised by the defendant in opposition to the judgment below. The defendant argues that it had no notice of the mound of snow at the intersection and, further, that the jury should have been required to find that the defendant had notice of the dangerous condition. We believe that the evidence demonstrates that the defendant possessed notice and, moreover, that a finding of notice was implicit in the jury's determination of liability in this case. The defendant complains that no witness actually saw the defendant's employees deposit the large snow pile at the intersection, but this argument overlooks the witnesses who testified that the snow mound bore markings that indicated that it had been pushed into its position by a snowplow. This evidence also served to establish that the defendant had notice of the condition, a requirement mentioned in section 3—102(a) of the Tort Immunity Act. The plaintiff's theory at trial was that employees of the defendant, through their snow-removal efforts, left a large mound of snow at the intersection where the collision occurred. The plaintiff did not argue that the defendant simply failed to reduce the height of a snowdrift that had formed at that location; instead, the plaintiff theorized that the defendant had plowed snow into a pile at that point. In finding the defendant liable under this theory, the jury would have necessarily concluded that the defendant had notice of the hazard it created.

In a related contention, the defendant complains that a new trial is required because the trial judge errone-

ously failed to use certain instructions proffered by the defense. The instructions at issue are Illinois Pattern Jury Instructions, Civil, Nos. 125.01 and 125.03 (Illinois Pattern Jury Instructions, Civil, Nos. 125.01, 125.03 (3d ed. 1990)). We do not believe that the proposed instructions were relevant here, for they are designated for use in cases involving a landowner's liability for a fall on ice and snow. In contrast to the intended application of those instructions, the present case does not involve a slip and fall and does not allege landowner liability. We believe that the trial judge properly refused the defendant's instructions.

The defendant also contends that the trial judge erred in permitting the jury to award the plaintiff damages for future pain and suffering. The defendant contends that the plaintiff failed to present expert testimony in support of those damages, and that the award therefore cannot be sustained. We need not determine here whether expert testimony is in some circumstances required to sustain an award for future pain and suffering, for we believe that the evidence presented by the plaintiff was sufficient. The plaintiff's accident resulted in severe injuries to his chest, lungs, and ribs. The testimony showed that the plaintiff continued, through the time of trial, to suffer pain from those injuries. His work has been affected, he tires easily, and he finds physical contact to be painful. We conclude that the evidence regarding the nature of the plaintiff's specific injuries to his chest area (see *A.O. Smith Corp. v. Industrial Comm'n*, 69 Ill. 2d 240, 245 (1977)) and the plaintiff's and his wife's testimony regarding the ways in which the accident continues to affect him were sufficient grounds on which the jury could base its award. We do not agree with the defendant that the testimony of the plaintiff's treating physician, Dr. Boomsma, was inconsistent with the award.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*