INTERNATIONAL MEMORY PRODUCTS OF ILLINOIS, INC., *et al.*, Plaintiffs-Appellants, v. METROPOLITAN PIER AND EXPOSITION AUTHORITY *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—01—1636

Opinion filed November 20, 2002.

Arthur S. Gold, of Gold & Coulson, of Chicago, for appellants.

Michael B. Kilgallon, of Kilgallon & Carlson, of Chicago, for appellees.

PRESIDING JUSTICE SOUTH delivered the opinion of the court:
This appeal arises from an order of the circuit court granting defendant Metropolitan Pier and Exposition Authority's (MPEA) motion for summary judgment. On January 7, 1999, International Memory Products (IMP) filed a second amended complaint against Graphic Arts Show Company, Inc., MPEA and The Freeman Companies (Freeman). IMP alleged that on or about August 30, 1997, IMP began constructing a booth at the "Print 97" show. IMP used the services of Graphic Arts and Freeman, which agreed to move the necessary materials in and out of the McCormick Place showroom. As part of the agreement, IMP paid Graphic Arts $11,200 for a one-week rental of its booth space.

Between September 3 and September 10, 1997, "Print 97," a trade show for businesses engaged in graphic arts, took place at McCormick

Place in Chicago, Illinois. McCormick Place is owned and operated by MPEA. IMP, an Illinois corporation engaged in the business of providing high-end custom solutions and system integrations in the computer industry, contracted to participate in the "Print 97" show. Graphic Arts, a corporation engaged in the promotion of trade shows for graphic arts businesses, leased a large portion of exhibit space from MPEA for the "Print 97" trade show. Freeman, a contractor, entered into an agreement with Graphic Arts to manage the "Print 97" show.

IMP leased a booth at the "Print 97" show to display its product, the Silicon Graphic Octane Computer System, to the print industry. It prepared its booth for the exhibit on Sunday, August 31, 1997, and on Tuesday, September 2, 1997. The booth was set up near one of the "emergency exit doors" on the east end of McCormick Place. During that period of time, the emergency exit doors were kept open so as to permit equipment for the show to be brought into the showroom.

In its negligence complaint, IMP alleged that during the show MPEA retained ultimate control of the opening and closing of the massive emergency exit doors, which permitted ingress and egress for all the exhibitors to transport their products, and that as a lessor of space from MPEA's tenant, Graphic Arts, IMP was a business invitee to which MPEA owed a duty to protect its property from heavy winds entering through the emergency doors located near its booth. The complaint further alleges that heavy winds damaged its exhibit to the extent that it could not be displayed in the trade show and destroyed a third of its booth. IMP argues that MPEA knew or, in the exercise of reasonable care, should have known of the propensity of heavy winds to enter through these emergency doors and that, as a result, MPEA was negligent for failing to protect IMP's property from the heavy winds coming through the emergency exit doors because it had actual knowledge of the potentially dangerous condition of heavy winds entering into the show due to prior incidents as a result of communications between MPEA employees and Freeman employees. IMP asserts that MPEA's employees had been directly informed by IMP and Freeman employees that wind had blown down a portion of its booth prior to the start of the show but that MPEA employees refused to close the doors.

During the course of discovery, nine depositions were taken.

Drew Massa, the manager of Freeman's risk management department, testified that Freeman is a trade show and convention contractor and was the drayage contractor for the "Print 1997" show. As a risk manager, Massa is typically on site for the major shows such as "Print 97," and he would set up a temporary office on the show floor. While working at McCormick Place, Massa has received complaints

about damage to property due to the wind. He testified that when he has walked around the site, he has seen booths blown down. However, he could not recall whether he received any complaints on September 2, 1997, regarding wind damage, nor could he recall whether he spoke to Earl McGee of IMP concerning damage to his booth during the 1997 print show. He did not know whether anyone at MPEA was aware of heavy winds entering McCormick Place on September 2, 1997, or of the damage to IMP's booth. He never contacted anyone at MPEA regarding wind damage and was not aware of any requests to close the doors due to heavy winds.

Massa further testified that the shows hire their own security during the move-in and move-out phases and during the shows on the show floor. Freeman hired teamsters to work the shows. The electricians, however, were employed by MPEA, and the exhibitors would order them at an MPEA desk located on the show floor. The show decides who the service contractors will be. However, Massa did not believe there were any contracts between MPEA and Freeman.

Lonell Fletcher, a security officer for MPEA working in the control room, was present at McCormick Place on September 2, 1997. His shift was from 10 p.m. on September 2 to 6 a.m. on September 3, and he was responsible for dispatching calls coming in on the telephone lines and for monitoring the security cameras and the computer security system. He did not know about the damage to plaintiff's booth until his supervisor informed him about having his discovery deposition taken.

Fletcher testified that there was a procedure to be followed before opening or closing an emergency door. The emergency door would be raised up if a teamster called the control room and requested that the door be raised so that the exhibitors could move their materials in and out of the showroom. Fletcher would then dispatch one of the MPEA security officers to go down to the floor. Once the security officer went down to the show floor, he would go to the door that needed to be opened and check with the show security to let security know that they had received a request from a teamster that an emergency door needed to be opened. The show security are hired by show management, not the MPEA, and they run the show floor. Show security can actually request that MPEA security not come onto the show floor for any reason, and MPEA security do not maintain a post on the floor. Once the show security approve, the MPEA security can then come onto the show floor and put a key into the door and electronically open it. If for any reason show security say that the door should not be opened, the request to open it will not be honored. Only MPEA can actually insert the key to open and close the door. Show security and

the teamsters work in tandem. If show security make a call to have a door closed, they have to check with the teamsters to make sure that they do not need to bring freight through that door. If the teamsters make a call to open the door, they must check with show security so that security can man the door for security purposes. Fletcher testified that there was always at least one request per show that the doors be closed due to the wind.

After reviewing the daily activity log for September 2, 1997, Fletcher stated that as of 7 a.m. all of the perimeter doors were opened, but there was no indication that they were ever closed during the duration of the day.

Fletcher testified that in his experience over the 10 years he has been working as a security officer there has never been a request made by a teamster to open or close the doors that was not honored. There have been requests from nonteamsters that were not honored but could have been had the requests been made through the proper channels. There are an average of approximately five calls per show from nonteamsters to open or close the doors. The reasons for the requests are due primarily to the weather being too cold or too hot. Fletcher did not recall ever receiving a direct call from an exhibitor requesting that the doors be closed due to a heavy wind. In his 10 years of experience, he has never opened or closed the doors without a request from a teamster or show security except on the last day of the move-out at midnight when the floor is being cleared.

Thomas O'Keefe, an MPEA electrician, testified that on September 2 he was responsible for installing electrical power for the booths at "Print 97." He discussed the wind entering through the emergency doors with many of the exhibitors on that day. He did recall, however, a booth being knocked over sometime between 9 p.m. and midnight. He heard a loud noise and went into the booth and unplugged the lights so that they would not start a fire. There was no one in the booth when he entered it. The emergency door near the IMP booth had been opened, but he did not open or close the emergency door because it was keyed by security personnel only and that was not his job.

Earl McGhee, a sales associate with IMP, assembled the booth on September 2. He was also in charge of making connectivity and software installations to the system, as well as manning the booth. He first noticed the drafts of wind coming toward the IMP booth during his first day of setup, which was August 31, 1997. The back wall to the booth blew over on that day. He informed an electrician named "Lou," who had on a uniform, that it was "awfully windy" and asked him if he could close the door. Both John Duffy and Ray Cortesi, other IMP

sales associates, were present at the time. McGhee testified that the electrician just ignored him. He did not ask him again on that day. Duffy also went over and talked with the manager of the electricians on that day about the wind, but McGhee was not present during this conversation.

On September 2, McGhee noticed the wind when he arrived at McCormick Place and that the door closest to his booth was open. The first thing he noticed was that the IMP booth wall had blown over again. He spoke with "Lou" again about the wind in Duffy's presence at approximately 10 a.m., but Lou did not respond to him. He spoke with him again at approximately 12 noon, and this time "Lou" told him that he needed to talk to someone in the trade show office. McGhee never pursued the matter any further because his primary responsibility was to set up the booth. He never mentioned the wind problems to anyone at the security booth.

McGhee left McCormick Place on that day at about 3 or 4 p.m. and returned that evening at about 9:30 p.m. When he came back to the IMP booth, the back wall of the booth was not perpendicular but on an angle. As he began fixing the back wall to make it perpendicular again, a tower located on the eastern side of the booth blew over with an "SGI octane," speakers and monitors attached to it. The door directly adjacent to the eastern portion of the booth was open. He does not remember any equipment being brought in or out of the door at that time.

McGhee testified further that he went to the booth where he spoke to "Lou" earlier that day and told him that "the booth just blew over." "Lou" said that he wanted to take pictures and disconnect the electricity. McGhee wrapped up the damaged parts in bubble plastic, and security took the parts to storage until the show was over. During the show, the doors adjacent to the booth were closed. There was also a booth east of the IMP booth that had been blown down that afternoon as well, and its exhibitors were yelling and screaming at "Lou."

McGhee testified that the person named "Lou" really could have been Drew Massa, since that name did seem very familiar. He could not remember if the person he spoke to really was named "Lou."

John Duffy, an IMP sales representative, testified that he was present during the "Print 97" show setup but was not present at the time of the incident. He was responsible for where the booths were going to be located. IMP contracted with Freeman to move in its booth and all of the products that would be a part of its booth. Duffy contracted with Graphic Arts for the space. Duffy initially had no problems with the location of the IMP booth. However, on Saturday,

August 30, when they were setting up the booth, the carpenters had problems setting up the booth due to the wind. On Sunday, August 31, the wind was blowing against the booth. He did ask someone generally, maybe a "forklift driver or someone like that," if he could lower the door, but he does not recall for whom this person worked.

On Tuesday, September 2, when Duffy came in at approximately 2:30 p.m., the wind was blowing hard against the booth. He went to the electricians' office and asked if someone could lower the door. The gentleman told him that there was nothing he could do about it, but that he should go and talk to one of the teamsters. Duffy spoke with the shop steward, who told him that he could not lower the door but that, if the booth got knocked over, they would put it up again.

Duffy spoke to a forklift operator/teamster about the wind again at approximately 6:30 p.m. The teamster directed him to another gentleman, who told him that if the booth blew over he would help him put it back up again but he could not lower the door. At that time they were still moving things onto the showroom floor through the door. Other than the forklift operator, the shop steward and the electrician, Duffy did not ask anyone else to close the door. When he left for the evening, the emergency door was still open. He never had any problems with the wind during other shows at McCormick Place, but the booth had never been located in the area near the emergency door. After the show was over, the booth was dismantled by the teamsters from Freeman.

Roger Meyer, a security officer with MPEA in charge of control operations, was working on September 2 at the "Print 97" show from 2 p.m. to 10 p.m. Since he has been working as a control operator, he has received complaints about the wind. When he got a complaint, he would contact the show manager, who would decide whether or not they could lower the doors. If security personnel could not reach a show manager, they would not lower the doors on their own. Meyer testified that although they are not supposed to lower the doors without the approval of a show manager, he would lower the doors when he was on the squad if a show manager could not be located and would continue to try to contact one to let him know what he had done. In his opinion, the security personnel did have a certain amount of discretion to close the doors in certain situations when the wind was causing damage to a booth. He did not know of anyone else who had ever closed the doors without the approval of a show manager, and he had only done it twice in his 12 years as a security officer for the MPEA.

Finally, Meyer testified that if he ever received a request to lower a door due to possible wind damage, he would never ignore it. Based

upon the "log sheet" for September 2, after the door was opened in the morning, there was never a request made to lower it during his shift.

Madonna Doyle, an MPEA electrician, testified that she was present on the evening of September 2. She received complaints from people on the showroom floor about it being cold, but she did not recall getting complaints about the wind or about booths being blown down due to the wind.

Herman Jackson, an MPEA security supervisor for 13 years in the north building, testified that his responsibilities included setting up the work assignments for the officers, reviewing the daily logbook assignments, and monitoring the officers on their assignments. As of September 2, 1997, he was not aware of any requests to close the doors at the north building during a show due to high winds. MPEA security never open or close the doors unless they have been given authorization to do so by the teamsters, and their only responsibility is to activate the switch. Jackson testified that each show provides its own security.

Patrick Nolan, a teamster, testified that he normally worked at McCormick Place. Each time someone wants to have a show at McCormick Place, he has to contract with the teamsters to move all of his materials in and out of the showroom area. Although he has never seen the wind coming in through the emergency doors knock over exhibits, he knows it has happened. The teamsters cannot prevent MPEA security from opening the doors, and there are no labor laws that would permit only the teamsters to authorize the opening and closing of the doors. The normal procedure is that since MPEA security are not on the floor, they would receive a request to open or close the doors from people working on the floor.

Although the teamsters have a contract with MPEA, they do not work for them. They work primarily for the outside trade show contractors, and in this particular case, they were working for Freeman.

James Nelson, the corporate loss prevention manager for MPEA, testified by way of affidavit that MPEA did not, nor did any of its employees, decide when the loading dock doors would be opened or closed. Those decisions were left up to the show and its contractors. MPEA security would turn a key and open or close the doors on the instructions of the show representative.

After all of the discovery depositions were taken, MPEA filed a motion for summary judgment arguing that it cannot be held liable for the damage to plaintiff's property because it is protected under section 3—105 of the Local Governmental and Governmental

Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 *et seq.* (West 1998)). In addition, MPEA argued that there was no duty to plaintiff because MPEA was merely a licensor and did not participate in putting on the "Print 97" show, nor did it assume a duty to protect plaintiff from the wind. Finally, MPEA argued that even if there was duty to plaintiff, it is protected under section 3—108 of the Tort Immunity Act for any improper or negligent supervision of activities of the contractor of the trade show. The court granted the motion, stating that MPEA did not owe a duty to plaintiff.

Plaintiff raises one issue for our consideration: whether the trial court erred in granting summary judgment in favor of MPEA based upon the allegations in plaintiff's second amended complaint and the facts established during discovery.

■ Summary judgment may be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2000).

■ "In a cause of action alleging negligence, the plaintiff must establish the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of that duty." *Parsons v. Carbondale Township*, 217 Ill. App. 3d 637, 643, 577 N.E.2d 779, 783 (1991). In the absence of a showing from which the court could infer the existence of a duty, no recovery by the plaintiff is possible as a matter of law and summary judgment in favor of the defendant is proper. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 215, 531 N.E.2d 1358 (1988). Whether under the facts of a case there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court. *Rowe*, 125 Ill. 2d at 215; *Pelham v. Griesheimer*, 92 Ill. 2d 13, 18-19, 440 N.E.2d 96 (1982); *Barnes v. Washington*, 56 Ill. 2d 22, 26, 305 N.E.2d 535 (1973).

■ Plaintiff maintains that the trial court erred as a matter of law when it held that MPEA did not owe it a duty of care. Since the MPEA is a public entity, whether it owes plaintiff a duty of care is governed by the Tort Immunity Act. 745 ILCS 10/1—101 *et seq.* (West 1998); see *Gusich v. Metropolitan Pier & Exposition Authority*, 326 Ill. App. 3d 1030 (2001) (the Metropolitan Pier and Exposition Authority is immune under the Tort Immunity Act).

Whether a duty of care exists is a question of law to be determined by the court and thus may be determined on a motion for summary judgment. *Pelham v. Griesheimer*, 92 Ill. 2d 13, 18-19, 440 N.E.2d 96 (1982); *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421, 592 N.E.2d 1098 (1992).

■ In Illinois, a governmental entity was originally immune from tort liability under the doctrine of sovereign immunity. However, Illinois abolished sovereign immunity in 1959. *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E.2d 89 (1959). In 1970, the Illinois Constitution also abolished the doctrine of sovereign immunity, except as the legislature may provide by statute (Ill. Const. 1970, art. XIII, § 4), and in 1965, the legislature enacted the Tort Immunity Act (now see 745 ILCS 10/1—101 *et seq.* (West 1998)). The Tort Immunity Act adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions. *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 506-07, 565 N.E.2d 654 (1990). Based on these developments, "[g]overnmental units are liable in tort on the same basis as private tortfeasors unless a valid statute dealing with tort immunity imposes conditions upon that liability." *LaMonte v. City of Belleville*, 41 Ill. App. 3d 697, 705, 355 N.E.2d 70 (1976), citing *Krieger v. Village of Carpentersville*, 8 Ill. App. 3d 243, 247, 289 N.E.2d 481 (1972); accord *Austin View Civic Ass'n v. City of Palos Heights*, 85 Ill. App. 3d 89, 95, 405 N.E.2d 1256 (1980). The legislature created no new duties when it enacted the Tort Immunity Act; it created only immunities and defenses. 745 ILCS 10/3—101 *et seq.* (West 1998).

While MPEA does have a duty under the Act to maintain its premises in a reasonably safe condition, it does not owe a duty of ordinary care to maintain its premises for the benefit of plaintiff under the facts of this case.

■ Under section 3—102 of the Tort Immunity Act, governmental entities have a duty to exercise reasonable and ordinary care in maintaining public property. 745 ILCS 10/3—102(a) (West 1998).

Section 3—102(a) states:

"(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3—102(a) (West 1998).

It is important to remember that the Act does not create any new liabilities for negligent acts or omissions that did not previously exist

but merely articulates the common law duty to which the subsequently articulated immunities apply. *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 412, 583 N.E.2d 538 (1991).

In this case, plaintiff has not articulated a common law duty that has been imposed upon a landowner for wind damage to a plaintiff's property. Furthermore, section 3—102 does not impose the liability upon MPEA that plaintiff suggests.

Plaintiff suggests that since MPEA knew or should have known about the winds entering the building, under section 3—102 it had a duty of reasonable care to close the emergency doors to guard against the damage to its property.

First, section 3—102 does not impose liability on a governmental entity in situations in which it has exercised ordinary care in maintaining its property in a reasonably safe condition, unless the plaintiff has proven that the public entity has actual or constructive knowledge of a condition that is not reasonably safe. Opening the emergency security door is not an unreasonably dangerous condition whereby liability can be imposed on MPEA under section 3—102.

In the cases within which Illinois courts have imposed liability under section 3—102, each plaintiff alleged an unreasonably safe or defective condition on the public entity's property itself that was created by the public entity. See *Martin v. Chicago Housing Authority*, 264 Ill. App. 3d 1063, 1080-81, 637 N.E.2d 506 (1994) (city owed duty of reasonable care to elevator mechanic's helper to maintain inspection switch and other elevator-top controls, where plaintiff was injured as a result of the unreasonably dangerous condition of the elevator brought about by the Chicago Housing Authority's failure to adequately inspect and maintain it or to permit others to do so); *Santelli v. City of Chicago*, 222 Ill. App. 3d 862, 868, 584 N.E.2d 456 (1991) (the court held that the plaintiff's complaint against the city stated a cause of action for negligence where the city was negligent in failing to remove a raised median strip and in failing to maintain an "S" curve in a reasonably safe condition; therefore, the city was not immune from liability). Plaintiff has cited no cases, nor can we find any, in which a duty was imposed on a public entity due to its failure to protect a plaintiff from heavy winds entering public property. See *Mostafa v. City of Hickory Hills*, 287 Ill. App. 3d 160, 677 N.E.2d 1312 (1997) (failure to cite authority for argument constitutes waiver of argument on appeal).

Furthermore, plaintiff has never alleged that there was a defective condition on the property of McCormick Place for which MPEA could be held liable in tort. Therefore, we cannot impose one in this case in derogation of the Act.

■ Second, the first section of the first sentence in section 3—102(a) specifically provides: "Except as otherwise provided in this Article ***." 745 ILCS 10/3—102(a) (West 1998). In relation to this language, section 3—105(a) states in pertinent part:

"(a) Neither a local public entity nor a public employee is liable for an injury caused by the effect of weather conditions as such on the use of *** other public ways, or places, or the ways adjoining any of the foregoing *** or structures on or near any of the foregoing or the ways adjoining any of the foregoing. For the purpose of this section, the effect of weather conditions as such includes but is not limited to the effect of *wind* *** *but does not include physical damage to or deterioration of* *** *other public ways or place or the ways adjoining any of the foregoing.*" (Emphasis added.) 745 ILCS 10/3—105(a) (West 1998).

Plaintiff maintains that section 3—105(a) does not apply to the facts of this case because sections 3—102(a) and 3—105(c) impose a duty on MPEA to reasonably protect it from the damaging effect of the wind to its property. Plaintiff relies on *Fearheiley v. Summers*, 246 Ill. App. 3d 86, 614 N.E.2d 1377 (1993), in support of its position, where the court discusses a landowner's or occupier's duty to its entrants.

In *Fearheiley*, the court addressed the common law duty to an invitee in relation to the Premises Liability Act (740 ILCS 130/1 *et seq.* (West 1998)). *Fearheiley v. Summers*, 246 Ill. App. 3d 86, 614 N.E.2d 1377. *Fearheiley* is readily distinguishable from the case at bar. While the Premises Liability Act "did not significantly alter the common law duty owed to invitees" (*Fearheiley*, 246 Ill. App. 3d at 89), the Tort Immunity Act adopted the general principle that local public entities are liable in tort, but this liability was limited by an extensive list of immunities (*Barnett v. Zion Park District*, 171 Ill. 2d 378, 386, 605 N.E.2d 808 (1996)).

In *Ziencina v. County of Cook*, 188 Ill. 2d 1, 719 N.E.2d 739 (1999), the Illinois Supreme Court addressed the interplay between sections 3—105(a), 3—102(a) and 3—105(c). In that case, a motorist was injured in a collision at an intersection of two highways and filed suit against the county alleging that the accident was caused by a mound of snow on the corner of the intersection created by the county's snow-removal efforts. *Ziencina*, 188 Ill. 2d at 3-4. The supreme court discussed the development of the "natural accumulation rule" and concluded that the snow-removal efforts of the county's employees created an unnatural accumulation, and therefore, the county was liable under the circumstances of that case. The supreme court stated, "It is clear that a local public entity has no duty to remove natural ac-

cumulations of ice and snow from public property. *** [H]owever, the immunity conferred by section 3—105(a) is made subject to the requirement found in sections 3—102 and 3—105(c) that local public entities exercise due care ***. [T]his latter requirement means that, if a local public entity undertakes snow-removal operations, it must exercise due care in doing so." *Ziencina*, 188 Ill. 2d at 13-14.

Although the case at bar does not involve the natural accumulation rule, we find the supreme court's reasoning in *Ziencina* applicable to the facts of this case. Since MPEA had no duty to protect plaintiff from the effects of the wind coming into McCormick Place, the only way that MPEA can be held liable for the damage to plaintiff's property under sections 3—102(a) and 3—105 is if the facts of this case indicate that MPEA has somehow voluntarily undertaken a duty to protect plaintiff's property from the effects of the wind.

Based upon the pleadings, affidavit and depositions on file, we cannot say that MPEA voluntarily undertook to protect plaintiff. First, there was no contract between MPEA and plaintiff imposing a duty on MPEA. Second, the depositions and affidavit establishes that there was no assumed duty on the part of MPEA. Massa, the risk manager of Freeman, testified that he had never contacted anyone at MPEA regarding the wind on September 2 and that he did not recall receiving any complaints regarding wind damage. He stated that the shows hired their own security personnel and, therefore, MPEA security did not run the floor during the shows. He also stated that he did not think that there were any contracts between Freeman and MPEA.

Fletcher, a security officer for MPEA, stated that he did not know about the wind damage to plaintiff's booth on September 2 and that there was a definite procedure to be followed in opening or closing any of the emergency doors. He stated that in his 10 years of experience, he has never opened or closed the doors without a request from the show security. Fletcher stated that the show security are hired by show management, not MPEA, and that they run the show floor. He stated that MPEA security normally will not come onto the showroom floor and that the only reason that they do come onto the floor is to insert the key to open and close the doors.

O'Keefe, an MPEA electrician, stated that he never opened or closed the emergency security door.

McGhee, plaintiff's sales associate, stated that he asked someone by the name of "Lou," who could have quite easily been "Drew," to close the door on several occasions. He said that on September 2, "Lou" told him to talk with someone in the trade show office about the wind problems, but he never pursued it because he wanted to finish setting up the booth for the show.

Duffy, another sales associate working for plaintiff, stated that he spoke to several people generally about the wind and if they could close the door, but he did not recall who these people worked for.

Meyer, a security officer at MPEA, stated that he received complaints about the wind while working at McCormick Place, but that MPEA would first contact the show managers to find out if they could lower the door. If MPEA could not contact them, they would not lower the door. Meyer stated that he personally would lower the door if he received a complaint about the wind, but he would continue to try to contact a show manager to let him know what he had done. However, Meyer stated that he was at work on September 2 from 2 p.m. to 10 p.m. and never received a request to close the emergency doors near plaintiff's booth.

Doyle, an MPEA electrician on the showroom floor on September 2, stated that she did not receive any complaints about the wind.

Jackson, an MPEA security supervisor for 13 years, stated that MPEA security was not supposed to open or close the doors without prior authorization from the teamsters to do so and that their only responsibility would be to activate the switch.

Nolan, a teamster, testified that he normally worked at McCormick Place. He stated that to his knowledge the normal procedure was that MPEA security would receive a request to open or close the doors from someone on the showroom floor before opening the doors, since the teamsters were not personally on the floor supervising and witnessing what was going on. He also stated that although the teamsters had a contract with MPEA, they did not work for it. They worked for the outside contractors, namely, Freeman in this case.

Nelson, the corporate loss-prevention manager for MPEA, stated that MPEA did not, nor did any of its employees, decide when the loading dock doors would be opened or closed. He stated that those decisions were left up to the show and its contractors and that MPEA security would merely turn a key to open or close the emergency door.

■ The foregoing indicates that MPEA essentially opened and closed the security door after being instructed to do so by either show security or the teamsters on the showroom floor. Furthermore, the testimony seems to indicate that MPEA security were never made aware of the wind entering through the emergency doors on September 2. Plaintiff's own employees testified that they did not know whether the individuals they spoke to were MPEA employees and McGhee could not remember the name of the person he had spoken to, who could have quite easily been "Drew," Freeman's employee. All of the evidence establishes that MPEA security were never on the floor and the only employees who were on the floor were electricians, and the

electricians never opened or closed the doors. A voluntarily assumed duty is limited by the extent of the undertaking. MPEA's only act in this was to turn the key that activates the emergency door, and it appears that on September 2 this request was never made. We cannot say, under these circumstances, that MPEA voluntarily assumed a duty to protect plaintiff's property.

As such, section 3—105 is applicable to preclude recovery in favor of plaintiff and summary judgment in favor of MPEA was proper.

Since we find that section 3—105 provides immunity to MPEA, we need not address plaintiff's argument that section 3—108(a) also does not apply.

Based upon the forgoing, we find that the trial court was correct in granting summary judgment in favor of MPEA.

Affirmed.

WOLFSON and HALL, JJ., concur.