2019 IL App (1st) 173070

No. 1-17-3070

Third Division
May 22, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MICHAEL GRIFFIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 L 9737 |
| | ) | |
| PRAIRIE DOG LIMITED PARTNERSHIP, | ) | Honorable |
| d/b/a Mullen's Bar and Grill, | ) | Patrick Foran Lustig and |
| | ) | Edward Harmening, |
| Defendant-Appellant. | ) | Judges, presiding. |
| | ) | |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Prairie Dog Limited Partnership, doing business as Mullen's Bar and Grill (hereinafter referred to as defendant, Mullen's, or the bar), appeals the jury verdict and judgment entered in favor of plaintiff, Michael Griffin, for injuries sustained as a result of defendant's negligent hiring and training of security personnel at Mullen's. After a second trial, the jury awarded $275,000 in damages, reduced by Griffin's 15% contributory negligence, for a total judgment of $233,750. On appeal, defendant asks this court to

(1) grant a new trial, (2) enter a remittitur of $145,000, or (3) reinstate the verdict and judgment from the 2016 trial. For the reasons that follow, we affirm.

¶ 2                                     I. BACKGROUND

¶ 3        On Saturday, September 13, 2014, Griffin fractured his wrist when he was roughly escorted out of the bar by Trent Washington, one of defendant's employees. The second amended complaint alleged that defendant was negligent in failing to interview, conduct background checks, review personal references, keep records, and provide training for the bar's bouncers and that such negligence resulted in Griffin's injuries.

¶ 4                    A. 2016 Jury Verdict and Motion for New Trial

¶ 5        After a three-day jury trial, the jury returned a verdict in favor of Griffin on September 2, 2016. The jury found damages to be $46,122 and itemized the award as follows on the provided verdict form:

> "Loss of a normal life experienced and reasonably certain to
> be experienced in the future.                                         $46,122
>
> The pain and suffering experienced and reasonably certain to
> be experienced in the future as a result of the injuries.              $0"

The jury also found that Griffin was 49% negligent and reduced his award for damages accordingly to $23,522.22.[1]

¶ 6        Griffin moved for a new trial solely on the issue of damages, arguing that the jury's verdict was manifestly inadequate for awarding $0 for pain and suffering. Defendant responded that the jury properly discredited Griffin's subjective evidence of his pain and suffering. Defendant requested that, if a new trial was granted, it be on all issues because liability and damages were closely intertwined in this case. The motion was denied by the

---

[1]This is the corrected amount from the judgment entered on September 6, 2016. The jury listed $22,600 as the final award after reducing the award by 49%, which was a calculation error.

trial court after briefing and oral arguments.[2] In addressing the motion, the court only noted that it believed the jury was subject to confusion over the wording on damages due to lines in the verdict form that were combined. On January 17, 2017, the trial court, *sua sponte*, granted a new trial on all issues.[3]

¶ 7                                    B. 2017 Jury Trial

¶ 8        Prior to the second jury trial, Griffin filed an emergency motion on June 5, 2017, to continue the trial and reopen discovery due to newly discovered evidence of Washington's out-of-state criminal convictions. The motion was denied, and the case proceeded to a hearing on the pending motions *in limine*. The trial court ruled on over 50 motions *in limine*, including one addressing Washington's convictions. A majority of these were granted without objection, and those pertinent to this appeal will be discussed with defendant's claims. The evidence adduced during the second trial was as follows.

¶ 9                                   1. Plaintiff's Account

¶ 10       Griffin testified that around 10:30 p.m. on September 13, 2014, he and his then-girlfriend, Shauna Nugent, met Nugent's roommate, Ruth Cawley, at Mullen's. That night, Griffin consumed six or seven drinks, including wine at dinner before beer and mixed drinks at the bar. At closing time, around 2 a.m. on September 14, Griffin finished his drink, grabbed a jacket, and was the first of their group to walk towards the exit. He heard Cawley, who was about 10 paces behind him, calling after him to say that he had grabbed the wrong jacket. Griffin stopped approximately 10 feet from the exit to turn and look back; however, the next thing he recalled was sitting on the ground outside the bar.

---

[2]The hearing transcript from November 30, 2016, containing the full arguments on the motion is not included in the record.

[3]The record is unclear regarding the trial court's reasoning for acting *sua sponte*. There is no explanation in the report of proceedings nor in the written order from the common law record.

¶ 11    Griffin was unsure of how long he sat on the ground and had no recollection of how he ended up outside with his back against the wall and his legs out in front of him. He felt a lot of pain in his left wrist and had scratches behind his ear and a big lump on the back of his head. Nugent and Cawley were in front of him and eventually helped him to his feet while other people were standing nearby. Griffin was taken to the hospital by ambulance where he completed a CT scan and X-rays. His left wrist was placed in a splint with instructions to follow up with an orthopedic doctor because he likely had a wrist fracture. He spent the rest of the night at the hospital and filed a police report in the morning. He also delayed his return home to New York due to the pain in his wrist and to retain legal representation in Chicago.

¶ 12    Griffin denied being intoxicated to the point of slurring his words or stumbling around. He further denied being cut off from ordering drinks, dancing, and provoking or resisting the actions of the security staff at Mullen's. It was also established for the record that Griffin had black hair and a black beard.

¶ 13                          2. Washington's Account

¶ 14    Washington testified that on September 13, a regular customer was having a birthday party and Griffin was a part of the "birthday entourage." That night, the bar was crowded and Washington was alerted to a bar patron, who he identified as Griffin, bumping into the deejay's equipment. According to Washington, this information was relayed by a manager. Washington positioned himself near the deejay and monitored the situation. Griffin continued dancing with a woman and enjoying the birthday party until the end of the night. Although he was behaving "wild," Washington did not eject Griffin because he was with the group that included regular customers.

¶ 15        However, as the bar was clearing out, Griffin did not want to leave. His girlfriend had already walked out, but Griffin did not follow. Washington put his arm out to stop Griffin from returning to the bar, either to try grabbing a jacket or to finish his drink. Griffin tried to push past him. Washington "swung [Griffin] around and showed him *** the door." Griffin then called Washington a derogatory name and tried to hit Washington with his elbow. Washington blocked Griffin's elbow by grabbing it with one hand and then pushed him out the door in one motion. Griffin went out the door face forward. Washington further testified that he acted alone, although another employee, Brian Page, may have opened the front door as they approached. Washington did not see Griffin fall. After pushing Griffin out, Washington walked back into the bar to resume his duties and never saw Griffin again. He was not asked to file an incident report, and he left shortly after his shift ended.

¶ 16        Washington's identification of Griffin was challenged on cross-examination, and he stated that he did not know the names of the parties involved and could not give a description of Griffin. He simply "ha[d] a good memory" and could remember the individual involved in the incident "once I s[aw] him."

¶ 17                                    3. Witness Accounts

¶ 18        Nugent testified that she married Griffin in December 2016, but at the time of the incident, Nugent and Griffin were newly dating. They went to Mullen's to meet up with her then-roommate Cawley and other friends. Between 10:30 p.m. or 11 p.m. to closing around 2 a.m. Nugent had three or four drinks in addition to an earlier glass of wine at dinner. Nugent believed that Griffin appeared sober and recalled that their group remained on the other side of the bar away from the deejay throughout the night.

¶ 19        Nugent confirmed Griffin's testimony regarding their departure from the bar. Nugent further testified that she saw a bouncer suddenly come from the left, grab Griffin by the chest, and aggressively shove him out the door in a manner similar to a rugby or football tackle. She believed that the action was completely unprovoked and denied hearing any exchange of words or seeing Griffin resist. Nugent did not see or hear Griffin hit the wall outside. She ran to him and found him sitting against the wall, unconscious, with his head down. His shirt was ripped and there was blood on the back of his head. She could not recall how long he remained unconscious, but she waited with him for the ambulance.

¶ 20        As they waited, she was approached by Justin Flynn, another bar patron, who provided his number and expressed his concern over what happened. She also stated that a bar manager named Bill checked in with them, but she did not remember much else. She accompanied Griffin to the hospital and stayed until he was released. In the morning, Griffin was "more himself," and he remembered the bouncer grabbing him. She accompanied him to the police station so that he could file a police report before bringing him back to her place. Griffin managed to sleep for a few hours but woke up crying from the pain in his arm.

¶ 21        Cawley testified consistently with Griffin and Nugent about the incident resulting in Griffin's removal from the bar around closing. She further testified that she had arrived at the bar around 8 p.m. for dinner and drinks and to celebrate a friend's birthday. She remembered Griffin and Nugent arriving around 11:30 p.m. and that they stayed at the same table at the bar with her for the rest of the night. Around 12:30 p.m., Cawley's friend, Martin Gallagher, who had fair brown hair with no facial hair, was escorted out of the bar. Gallagher was drunk, stumbling, and even "banging" into people and the deejay's speaker system. The bouncers checked in on Gallagher before taking him from the dance floor to the front door.

During this time, the bar was still busy and full, music was playing, and the lights were off. Cawley could not clearly see the entire incident with Gallagher, but she did not see him struggling with the staff.

¶ 22    Unlike Nugent, Cawley heard a loud thump, "like a bang" when Griffin was shoved out the door. She and Nugent ran out to see Griffin, and she noted that the bouncer was still standing by the door. He then went back into the bar and locked the door. Cawley also recalled a bar manager sticking his head out the door and exchanging words with Nugent before popping back inside and locking the door again. Cawley denied seeing Griffin dance at any point that night or hearing any exchanges between Griffin and the staff.

¶ 23    Flynn testified that he had no relationship or connection with the parties in this case. At closing time, he recalled that the bar's lights were on and no music was playing. Flynn heard a noise behind him, turned around, and saw a bouncer holding onto Griffin and "running him out the door." He was standing approximately 20 feet from Griffin and the bouncer, and the bar was fairly empty. He did not hear any other commotion or exchange between Griffin and the bouncers prior to Griffin being thrown out. The bouncer's action was not quite a tackle but was "as forceful as you can get." Flynn and his friends stood in the bar unsure about what to do next. Another bouncer guided the original bouncer, who showed no resistance, back toward the bar. Flynn left the bar and saw Griffin sitting on the ground a few steps from the front door with his back against a brick wall. Griffin was conscious but appeared confused and his girlfriend was next to him. Flynn spoke with Nugent and gave his phone number.

¶ 24    Jeffrey Heytow was a deejay, employed by Mullen's, working the night of the incident. His hours typically ran from 9 p.m. to 4:30 a.m., which included equipment setup and breakdown. He played music starting at 10 p.m. until last call at 2:30 a.m., and the bar closed

at 3 a.m. On the night of September 14, 2014, Heytow recalled a rowdy bar patron who was leaning on his equipment while dancing. Heytow identified Griffin in court as the rowdy patron, but later on cross-examination, he could not remember whether the patron had facial hair or glasses, blaming it on the passing of time. Heytow stated that he asked Washington for help in dealing with the rowdy patron at least three times during the night. Heytow gave conflicting testimony about when the ejection occurred and whether he was still playing music before and after the incident. He testified that, eventually, the bouncers came together to eject the patron from the bar. His view was obstructed because the bouncers stood with their backs to him, forming a wall; however, he saw the patron flailing his arms.

¶ 25    Brian Page was the head of security at Mullen's and worked with Washington the night of the incident. He corroborated Heytow's testimony that Washington had been asked to deal with a rowdy patron and had issued two warnings prior to removal. Page described himself "opening a path" for Washington to escort the patron out. Washington walked behind the patron who was intoxicated, "throwing elbows," and name calling as they escorted him out. Page denied ever forming a "human wall" and claims he did not touch the patron. Page acknowledged that the patron fell once outside, but he had previously testified that the patron fell face forward with his hands out in front of him. Page went outside to check on the patron, who was walking away. The patron's girlfriend did not want to leave and insisted on speaking to a manager. Bill Hohenadel came out to speak with her. Page stated that the police were not called, he did not personally ask for any witness accounts, and he never filed an incident report about the matter. If any discussions about the incident were had, Page believed they were discussed casually that night between the employees inside the bar after

they closed. Page recalled a separate meeting after the lawsuit was filed with the general manager and lawyers but could not recall who else was present or the content of the meeting.

¶ 26                                    4. The Injury and Treatment

¶ 27        Griffin returned to New York on Monday, September 15, and later met with Dr. Schildhorn who treated him over the course of three months. Throughout this time, Griffin testified to having limited mobility, soreness, and a lack of strength in his left hand. Griffin tried physical therapy sometime after his final visit with Dr. Schildhorn but did not go more than twice. Griffin gave up his hobbies such as mountain biking, snowboarding, and golfing due to lingering aches and pain in his wrist, which would be aggravated by these activities. He stated that the pain had become more frequent over time and had grown in intensity, including sharp pains followed by periods of dull, aching pain. Additionally, he struggled with completing daily activities from the time his arm was in a cast or splint to present day. Griffin's work as a construction supervisor was also impacted by his injury because it was difficult to maneuver around the work site and climb ladders.

¶ 28        Dr. Schildhorn, an orthopedic surgeon with a subspecialty in sports medicine and shoulder injuries, testified[4] as a medical expert. Griffin first came to Dr. Schildhorn with his left wrist in a splint on September 25, 2014. Dr. Schildhorn removed the splint, took an X-ray of the wrist, and sent Griffin for a MRI. He could not establish a definitive injury but noted symptoms characteristic of a fracture. On October 10, 2014, Dr. Schildhorn reviewed the MRI and diagnosed a clear fracture of the scaphoid bone, a sprain in the wrist's ligaments, and swelling within the bone. He also found contusions and internal bleeding in the surrounding bones and soft tissue.

---

[4]Dr. Schildhorn's testimony taken via video deposition on June 23, 2016, was entered as evidence and played for the jury.

¶ 29      Dr. Schildhorn discussed common complications with scaphoid fractures, which may include avascular necrosis or non-union of the fracture site. Avascular necrosis is a complication that results in no blood flow across the fracture site leading to the death of some pieces of bone and further complications. Fractures that do not heal within six months are considered as non-union cases, at which point surgical intervention is often recommended.

¶ 30      Dr. Schildhorn placed Griffin in a long-arm cast, which extended from the wrist to the elbow for two weeks instead of the recommended four weeks, recognizing that it is difficult to tolerate and two weeks were likely sufficient at that time. On October 21, 2014, Dr. Schildhorn reexamined Griffin's wrist and transferred him from a long-arm cast to a short-arm cast for four weeks. On November 18, 2014, Dr. Schildhorn found the soft tissue swelling had dissipated and the fracture appeared to be slowly disappearing and approved switching Griffin from the short-arm cast to a thumb spica splint.

¶ 31      On December 16, 2014, Dr. Schildhorn examined Griffin once more and noted that he still displayed a level of tenderness and difficulty gripping. However, there was no noted change in the position of the fracture. At three months out from the injury, Dr. Schildhorn was worried about the possibility of a delayed union of the fracture. He sent Griffin for a CT scan for a more detailed imaging before drawing any conclusions about the necessity for surgical intervention. The CT scan showed that bridging across the fracture was about 90% completed so surgery was unnecessary and Griffin was nearly completely healed.

¶ 32      Dr. Schildhorn last saw Griffin on December 18, 2014. He had not permanently restricted Griffin from normal activities but cautioned that the bone was not 100% healed. He warned that smoking could slow the healing process and suggested avoiding normal sporting activities. Dr. Schildhorn spoke in general terms that using the casts and splints created short

term pains such as stiffness of the wrist and elbow joints, which in some circumstances could become permanent issues. He also noted the possible residual effects from a fracture included bruised, delaminated, or fractured cartilage, which would limit the individual's ability to move in a smooth, fluid fashion. Dr. Schildhorn further testified that he did not know whether Griffin would develop avascular necrosis because it could not be assessed at the time, but from the final visit, he thought Griffin's chances of avoiding such a complication seemed "promising."

¶ 33                                   5. Hiring and Training

¶ 34                                      a. Employees

¶ 35     Salim Ani testified that he had responded to interrogatories as the "District Manager" for Mullen's, however, his job duties only included visiting the premises during nonbusiness hours, typically between 5 a.m. and 6 a.m., to collect money, balance the books, sign checks, and manage payroll. He repeatedly stated that he was not involved in any hiring, training, or day-to-day operations in 2014 although he had previously worked in this role several years earlier.

¶ 36     Ani was asked to read aloud from a manual alleged to be Mullen's employee handbook. Ani had previously testified that he believed a manual existed, but that he was unsure if it was used at this particular Mullen's location. Ani reviewed the alcohol policies in the manual line-by-line and repeatedly stated that he did not know whether these practices were employed by the staff at Mullen's. Ani did testify that, to his knowledge, it was not in Mullen's business model to anticipate the use of force or violence, thus, defendant did not employ anyone trained or qualified in techniques involving the use of force. Ani was also asked to review a printout purporting to establish the Illinois Liquor Control Commission's

new requirement for all on-premise alcohol servers and others required to check identification on entry to undergo mandatory BASSET[5] training, effective July 1, 2018.

¶ 37    Griffin's counsel posed a series of questions about what business practices should be followed in the hiring and training process, specifically for employees authorized to use force, and why a business would choose to not follow these practices. Ani repeatedly stated that he did not know the answers. He later testified that to his knowledge, the security personnel's main job was to check identification at the door. Counsel then asked very specific hypothetical questions about whether Ani would hire individuals with various convictions, arrests, or anger management issues. Ani responded that he could not speak on behalf of defendant but that his personal hiring decision would depend on the circumstances, *e.g.*, the age of the conviction and his gut feeling about the person. Ani explained he believed that some people deserved second chances.

¶ 38    Ani verified defendant's discovery responses, which stated that there were no personnel files, disciplinary files, nor surveillance videos to turn over. Ani confirmed that he had previously testified that approximately nine cameras were set up around the premises to monitor the front and rear exits, upstairs area, kitchen, bar, and one camera gave a 360-view of the main room. These cameras recorded footage and stored them on a digital video recorder and would have been positioned to capture the events of September 14, 2014. However, according to Ani, the cameras had been out of working order for anywhere between 6 to 12 months preceding the incident. Ani explained that sometime in 2012 or 2013, defendant had received notice that the bar would be demolished due to new developments on the block. The bar was not demolished until April 2016, but there were no

_____

[5]Beverage Alcohol Sellers and Servers Education and Training (BASSET) is a training offered by the Illinois Liquor Control Commission that teaches employees of establishments serving alcohol how to monitor, manage, and respond to a customer's intoxication levels.

significant capital investments put into the bar during the intervening period. Thus, the cameras, among other things, were not functioning properly in September 2014 and defendant could not comply with counsel's written request or the court order asking for the preservation and disclosure of that night's surveillance video.

¶ 39    Page testified that he had worked for Mullen's from 2010 to 2016. His job duties included checking identification, monitoring intoxication levels, and preventing "wild antics." Before he was hired, he was interviewed by Justin Puckett. Puckett also conducted his training, which included review of the bar's rules, policies, and procedures. He was never given an employee manual but recalled reading it at some point. Page also completed BASSET training, which consisted of an eight-hour online course. He gave conflicting testimony about why he underwent the training, first saying it was State law and later stating that bars in close proximity to the Cubs stadium required the training because of a decision by the Board of Wrigleyville Directors. Page acknowledged that the use of force was required in some situations for self-defense or defense of others but insisted that defendant had never authorized him or other security employees to use force. Lastly, Page described having monthly review sessions with Puckett to discuss any complaints received and review policies.

¶ 40    Page further testified that he personally knew Washington from playing semipro football together and had recommended him for the position. He considered Washington to be a nonviolent, reliable person, with a "laid-back" attitude. Page recalled that he and Puckett both interviewed Washington separately. Page did not check any of Washington's references since he was one of the people vouching for Washington. Page testified to being qualified for and responsible for Washington's on-the-job training.

¶ 41        Washington testified that he worked at Mullen's in 2014 and 2015. He had heard about the job from Page, who also conducted his interview. Washington stated that Mullen's owner also interviewed him. The application form consisted of collecting his personal information and did not ask for any job experience. Washington confirmed that he had a criminal record, which he did not disclose to defendant when he applied. He was not aware of defendant conducting any criminal background check prior to hiring him.

¶ 42        Washington stated that he was not required to do any training prior to starting work and instead received on-the-job training about his duties and the bar's expectations. His duties included dealing with unruly guests and general crowd control. He stated that if he was alerted that a patron needed to be cut off from drinking further, and the manager gave the okay, then he would escort the intoxicated patron out of the bar. He was never tested or assessed in regards to personality or use of force, nor was he given an employee manual.

¶ 43        Heytow's testimony also briefly touched on defendant's hiring practice. At the time of the incident, he had been regularly working for defendant on weekends, holidays, and other special events for approximately two years. He did not formally apply for the job nor did he provide defendant with his date of birth, social security number, or other information. He was not provided with W-2, W-9, or 1099 tax forms documenting his pay. Heytow also denied ever receiving a copy of Mullen's employee manual or written materials regarding his duties.

¶ 44                              b. Plaintiff's Expert Witness

¶ 45        Peter Tomares was a part-time hotel and restaurant consultant working under the Apollo Hotel Consulting company. He held degrees in economics and business administration, and had 60-plus years of practical experience in the hotel and restaurant industry. He was also

TIPS[6] certified and stayed current on security and safety standards in the industry by attending seminars. For 18 years, he taught restaurant and hotel management at Parkland College in Champaign, Illinois. He also owned and managed several college bars from 1966 until they were sold or closed down in the 1990s. Starting in the early 2000s, Tomares developed his consulting business and worked as a consultant and expert witness on a number of cases involving issues such as slip and falls, rape, invasion of privacy, bed bugs, and double murder. Tomares reviewed the complaint, answer, and all the documents and depositions obtained during discovery, excluding the medical evidence which is not his field of expertise.

¶ 46    From the materials provided, Tomares concluded that the hiring process at Mullen's was particularly careless, bordering on indifference, and noted that defendant claimed to have an application form, but one was never produced. He could not find evidence of a formal screening process of potential employees. He emphasized that proper training and supervision was essential in security. Any force exerted should be used for restraint only, and in selecting security personnel, "brains are more important than brawn." In particular, he noted that security personnel should be screened for their temperament to see if they are capable of keeping a level head in response to any situation. He noted that interviews are not reliable for determining this factor and reviewing a candidate's work history and speaking to references is more important. The industry practice to run background checks is helpful in screening applicants that are appropriate for the specific, sensitive positions such as security.

¶ 47    Tomares believes that training was practically nonexistent at Mullen's. He opined that verbal training for security purposes was insufficient and there should be more than someone

---

[6]TIPS is an alcohol training course administered via a private organization similar to BASSET.

just "show[ing] the ropes" to a new hire. Instead, it would be important to have written protocols that everyone would be trained in to have continuity and consistency in addressing various scenarios, such as, dealing with unruly and disruptive patrons. In 2015, Illinois passed a law requiring training in the BASSET course, but implementation had been slow and the statewide mandate would be enforced in 2018. Prior to that, whether it was required was a county matter. In his opinion, it was essential to prudent bar management even if not previously required by law.

¶ 48    Tomares explained the training procedure employed at his bars, dubbed the "5 C's": circulate, cut off, converge, control, and call. To start, Tomares emphasized the importance of identifiable security, moving through the bar to act as a deterrent. Secondly, identifying potential customers who are overintoxicated requires alerting the bartenders and servers to stop serving the individual alcohol. Tomares noted that offering food to slow the absorption of alcohol in the body was an option but that it "doesn't do a heck of a lot." If trouble still occurs, the security people on the floor and a manager should converge on the individual and attempt to verbally defuse the situation. If that does not work, then a mild restraint, such as a bear hug from behind to keep the individual's arms down, should be used to control the situation. Lastly, the employees should call the police. Tomares also discussed the importance of creating and maintaining incident reports, which can be used to further train security personnel.

¶ 49    Tomares concluded that defendant exhibited a pattern of inadequate management because it did not maintain personnel records, incident reports, or documentation of the training offered, if any was indeed offered, nor did Mullen's conduct background checks, check references, or engage in essential screening of applicants. Tomares continued that these

business practices did not show a direct cause for the incident in September 2014, but certainly was a contributing factor. In his opinion, Mullen's did not follow the widely accepted prudent practices of most bars in the training of its staff, in particular with Washington, and made the choice to not employ sufficient procedures for the safety of its customers.

¶ 50                                c. Rebuttal Expert Witness

¶ 51       Ronald Hauri testified that he was a security consultant, former chief of police, and had written and taught regarding security in the past. As the current managing director of an independent consultant agency, he was retained by defendant for this case and reviewed the pleadings, depositions, police, fire, and medical reports, as well as Griffin's expert witness disclosures. The opinions he formed based on his 40 years in law enforcement and security work and his 20 years as an expert witness were as follows.

¶ 52       Hauri believed that the application, interview, and training processes were sufficient. He stated that Washington was properly instructed to not put his hands on patrons and to "guide them" if they needed to be ejected. He believed that Washington had been properly taught to not get emotionally charged by any insults a patron might say. Hauri further opined that the depositions showed defendant's employees properly issued warnings prior to ejecting the patron. He believed that Washington's use of force was appropriate in response to the patron resisting the ejection attempt.

¶ 53       Hauri also stated that a lack of record keeping as to personnel files, or the failure to check references, did not have an impact on the incident because these background issues would not reveal if an employee has a tendency to "manhandle" customers. Hauri stated that, in his experience working with other bars in Chicago, it was a common practice to trust a current

employee's vouching for a potential employee. This was typically sufficient in small businesses because a background check would not provide any additional information that would change the employer's mind. Hauri did not find that the bar failed to comply with local ordinances. Furthermore, in 2014, TIPS and BASSET certifications were completely optional. Hauri also noted that video surveillance cameras were optional for a bar like Mullen's, which is not a "late-license establishment" because it was not open past 3 a.m. Although he would advise all establishments to have a working, up-to-date video system, he acknowledged that many neighborhood bars in Chicago simply do not have functioning or well-placed and high quality cameras.

¶ 54    On cross-examination, Hauri was pressed on whether Mullen's was appropriately classified as a "small operation" where there were multiple locations throughout the Chicagoland area and even other states. Hauri was aware of, but not familiar with these other locations. However, this particular Mullen's had a capacity of 81 patrons when not using their patio, so Hauri believed this location was a small operation. Hauri was also asked about whether a candidate for a security position should be considered if they had a criminal conviction for a violent crime. Hauri responded that in general, yes, employers would avoid these candidates, but it also depends on the age and circumstances of the conviction. In the case of intentional nondisclosure by the candidate, most companies would terminate the employee for giving false information. Hauri also acknowledged that psychological screening is used in human resources and employment regulations but only as an indicator rather than a deciding factor for hiring decisions.

¶ 55    Hauri believed that defendant was not negligent in relation to Griffin's incident because it took reasonable security measures, instituted appropriate policies and procedures, and

conformed to the guidelines, practices, and protocol for a Chicago neighborhood bar of this size and type to secure the operation of its bar and the safety of the patrons and employees.

¶ 56                                      C. Jury Verdict and Posttrial Motion

¶ 57        After four days of testimony, the jury returned a verdict in favor of Griffin and determined Griffin was due $275,000 in damages. The verdict form itemized the damages as follows:

| | |
|---|---|
| "Loss of a normal life experienced; | $65,000 |
| Loss of a normal life reasonably certain to be experienced in the future; | $72,500 |
| The pain and suffering experienced; | $65,000 |
| The pain and suffering reasonably certain to be experienced in the future as a result of the injuries. | $72,500" |

The jury attributed 15% of the fault to Griffin's contributory negligence and reduced the total award accordingly to $233,750. Judgment was entered on June 9, 2017.

¶ 58        Defendant requested posttrial relief pursuant to section 2-1202 of the Code of Civil Procedure (735 ILCS 5/2-1202 (West 2016)). After briefing and argument, the trial court denied the posttrial motion on November 22, 2017. Defendant timely appealed and now raises many of the same issues.

¶ 59                                                  II. ANALYSIS

¶ 60        Defendant argues that the judgment entered against it cannot stand because it was denied a fair trial by the court's errors relating to (1) expert witness testimony, (2) references to evidence not before the jury, (3) irrelevant and prejudicial lines of questioning, (4) improper jury instructions, and (5) the use of prior criminal convictions. In the alternative, defendant

contends that the second trial was granted erroneously and requests reinstatement of the original judgment.

¶ 61                                 A. Defendant's Motion to Strike

¶ 62        As a preliminary matter, we note that defendant's motion to strike portions of Griffin's brief and his appendix relating to Washington's criminal arrest record in the state of Illinois was taken with the case. Defendant argues that these records have no relevance to the present appeal and were appended to the brief in an improper attempt to supplement the record. Griffin responds that this court may take judicial notice of the criminal record as a public record. Griffin contends that the records are relevant to the litigated issue of negligent hiring as they show Washington's background and are necessary to have a full understanding of the contested motions *in limine* rulings.

¶ 63        We find that, contrary to Griffin's assertion, Washington's criminal arrest record in Illinois is irrelevant to the present appeal. The trial court barred admission of the arrest record over Griffin's objection that his expert witness relied upon and should be allowed to testify about the basis of his opinion. This ruling is not being challenged by either party on appeal, thus we find that Griffin's assertion of the record's relevance is misleading. Regardless of whether this court has the right to take judicial notice of such appended materials, we grant defendant's motion to strike Griffin's appendix.

¶ 64                                 B. Plaintiff's Expert Witness

¶ 65        Defendant argues that the trial court erred in denying its motion *in limine* which sought to bar Griffin's expert, Tomares, from testifying because he was unqualified. Griffin objected to the motion arguing that defendant's sole complaint on qualifications centered on the fact that Tomares was from downstate Illinois rather than Chicago. Griffin maintained that such

objection went solely to the weight of the testimony rather than admissibility. The court agreed, finding that Tomares had a sufficient background to be considered an expert.

¶ 66 On appellate review, we are mindful that a trial court maintains broad discretion in the admission of evidence and in ruling upon a motion *in limine*. See *Green v. Union Pacific R.R. Co.*, 269 Ill. App. 3d 1075, 1082 (1995). A trial court's decision on a motion *in limine* will not be disturbed absent an abuse of discretion. *Hallowell v. University of Chicago Hospital*, 334 Ill. App. 3d 206, 210 (2002). Similarly, the decision of whether to admit expert testimony is within the sound discretion of the trial court and is also reviewed for abuse of discretion. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003).

¶ 67 "A person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions." *Thompson*, 221 Ill. 2d at 428 (citing *People v. Miller*, 173 Ill. 2d 167, 186 (1996)). " 'There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research. ' " *Id.* at 428-29 (quoting *Miller*, 173 Ill. 2d at 186). An expert's qualifications by knowledge, skill, experience, training, or education in a field require " 'at least a modicum of reliability.' " *Turner v. Williams*, 326 Ill. App. 3d 541, 552 (2001).

¶ 68 We cannot say that the trial court's *in limine* ruling allowing Tomares's testimony as an expert was an abuse of discretion. He testified that he had years of experience personally working in and managing bars as well as teaching courses on hotel and restaurant

management. The practical experience of managing bars, even if not in the Chicagoland area, is sufficient to qualify Tomares as an expert. Although the security needs of bars may not be identical to hotel and restaurants, the practices in hiring, training, and supervising security staff across the establishments may be transferrable. It is clear that Tomares's experience set him apart from a layperson's knowledge on the issues of negligent hiring and training for security staff and that such experience could be helpful to aid the jury in making its determination of fault.

¶ 69     Furthermore, the basis for a witness's opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence, not its sufficiency. See *National Bank of Monticello v. Doss*, 141 Ill. App. 3d 1065, 1072 (1986). The weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion. *Treadwell v. Downey*, 209 Ill. App. 3d 999, 1003 (1991). The burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion. *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981). Defense counsel was given ample opportunity to question Tomares's credentials, experience, and the basis for his opinions. Thus, we find that the trial court properly admitted Tomares as an expert witness, allowing the jury to determine the weight of Tomares's testimony.

¶ 70     Defendant also contends that the expert opinion offered was based on pure speculation and the trial court erred in allowing the testimony. Expert opinions lacking a sufficient factual basis are properly barred. *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 28-31 (2008). Defendant argued that Griffin's expert could only point out indirect causes, such as the failure to maintain personnel files and require TIPS and BASSET training, which may or may not have prevented the incident between Washington and Griffin. The court

noted that defense counsel could highlight the lack of clear proximate cause in cross-examination and allowed the testimony.

¶ 71      Tomares's conclusion that defendant exhibited a pattern of inadequate management was based on clear evidence as to the lack of personnel files and testimony about the hiring and training processes at the bar. Tomares was also able to plausibly connect his conclusion to imply that defendant was negligent in its hiring and training process. We do not agree that these conclusions were based on speculation. Tomares was not called to prove exactly how the bar could have prevented the incident between Washington and Griffin. His testimony was intended to aid the jury in determining whether defendant was negligent. In order to do so, the jury needed to understand what was the reasonable and ordinary care expected of similar establishments in hiring and training. Thus, Tomares was properly allowed to testify about his knowledge of common practices and industry standards as to hiring and training in comparison to defendant's practices.

¶ 72                          C. Surveillance Video

¶ 73      Defendant claims it was denied a fair trial where Griffin was allowed to mislead the jury and draw attention to the lack of a surveillance video documenting the incident. Defendant also contends that the video surveillance at issue was not under its control. Defendant maintains it is entitled to a new trial where the court allowed the jury to hear the irrelevant and inflammatory evidence.

¶ 74      During the motion *in limine* hearing, the court denied defendant's request to bar references to the missing surveillance video, noting that defendant's witness testimony could not be taken as "gospel" and the credibility of the surveillance system malfunction had to be taken into account. Thus, the court allowed Griffin to establish that there was video

equipment and that there should have been a video recording but did not allow Griffin to argue that the video recording had been purposely destroyed. Defendant would be given an opportunity to respond and explain the video's absence, *i.e.*, that the business was closing, there was no incentive to put capital investment in the building's security system, and the system may have been inoperable for several weeks or months prior to the incident.

¶ 75    In opening statements, Griffin's counsel stated that written and formal requests were made to defendant for the video. Defense counsel argued that Griffin had to request a specific instruction about the spoliation of evidence but that, even if he did, the trial court should deny such an instruction. The trial court did not make a ruling about a special jury instruction, but later reminded Griffin's counsel to avoid arguing that defendant had thrown away the video recording or "ditched it." Ani testified about the positioning of the cameras and explained the reason behind the missing videos. Heytow, Page, and Washington were questioned about the positioning of the cameras and whether the cameras would have recorded the incident. Hauri testified that it was a common issue in Chicago bars that funds were not invested in updating and maintaining surveillance cameras, especially because establishments like Mullen's were not required by law to have working surveillance cameras.

¶ 76    Defendant's arguments conflate two questions regarding the surveillance video. The first question is whether the trial court erred in ruling on the motion *in limine* and allowing argument related to the video in part. The second question, if the court ruled correctly, is whether counsel violated the motion *in limine* by insinuating that defendant was willfully withholding evidence.

¶ 77    The purpose of a motion *in limine* is to permit a party to obtain a pretrial ruling excluding inadmissible evidence and prohibiting interrogation concerning such evidence to avoid

making objections in the presence of the jury. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 792 (1992). Courts caution against granting such motions due to the potential danger of unduly restricting the opposing party's representation of its case. *Id.* at 793. As stated earlier, a trial court's ruling on a motion *in limine* is reviewed for an abuse of discretion. *Hallowell*, 334 Ill. App. 3d at 210. On review, we find that the trial court did not abuse its discretion in allowing testimony about the video surveillance tapes. There is no indication that a surveillance video of the event, if it had been properly recorded, would be inadmissible evidence. See *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562, 566 (2004) (a video recording may be introduced as evidence if it is properly authenticated and relevant to a particular issue).

¶ 78        Defendant did not present definitive proof about the breakdown of the surveillance system but nevertheless sought to prohibit references to and questions about the lack of such evidence. Defendant claimed such questioning would be prejudicial and draws comparisons to *Rutledge*, in which counsel was found to have misled the jury about evidence not presented. In *Rutledge*, the parties stipulated to the fact that the plaintiff's doctor was unavailable to testify due to an illness and that the doctor was under neither party's control. 230 Ill. App. 3d at 790. Nonetheless, defense counsel highlighted the missing testimony in closing arguments and questioned why the plaintiff did not call the doctor. *Id.* at 790-91.

¶ 79        In this case, we disagree with defendant's contention that the surveillance video was not under its control. An alleged equipment malfunction is not analogous to the unavailability of a third-party witness due to illness as the equipment was, at all times, in defendant's possession. Only defendant had access to the video, and we accordingly find that the video was under its control. Even if the malfunction was due to forces outside of defendant's

control, it was defendant's burden to prove the malfunction. As the parties did not stipulate to the matter of the missing evidence, it would be unreasonable for the court to take defendant's word at face value. The court explicitly addressed defendant's concerns about the potential for prejudice by allowing testimony about the circumstances surrounding the lack of footage. Thus, the court's ruling properly left it for the jury to determine the credibility of defendant's employee and whether the evidence was omitted for a good reason.

¶ 80     We further find that counsel's questions and statements in this case do not rise to the egregious level seen in *Rutledge*. The parties in *Rutledge* stipulated to the reason for the omitted testimony, but counsel nonetheless insinuated that the omission stemmed from the plaintiff's anger with the witness for giving him an unfavorable assessment regarding his injury. *Id.* Conversely, the parties here have divergent claims over what happened to the video footage. Thus, it was appropriate for Griffin's counsel to highlight that during opening statements. Counsel laid out, both in opening statements and the questioning of Ani, that requests to preserve the video were sent and defendant responded that the video was lost due to a malfunction. Questions to defendant's other employees were posed about whether they were aware if their actions would have been caught on video. Questions to Hauri focused on the standard business practices regarding surveillance videos. None of these questions rose to the same level of insinuations as the statements in *Rutledge*. Counsel never attempted to indicate that the witnesses or defendant did anything untoward regarding the review of and preservation of the video. Thus, we find that there was no prejudicial error to defendant by admission of the testimony about the surveillance video.

¶ 81                                     D. Cross-Examination

¶ 82    Defendant contends that the lines of questioning about patron safety, Washington's football history, and whether Griffin was a racist were prejudicial, irrelevant, and improper and denied it a fair trial. The scope of cross-examination rests within the discretion of the trial court and will not be disturbed on review absent a clear abuse of that discretion resulting in manifest prejudice to the party claiming error. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 533 (2000). Defendant asks this court to apply principles discussed in *Cancio v. White*, 297 Ill. App. 3d 422 (1998), to the questions posed here. In *Cancio*, the court noted "[i]t is improper to ask a question when counsel has no good-faith reason for asking that question." *Id.* at 431 (citing *People v. Nuccio*, 43 Ill. 2d 375 (1969)). The challenged line of questioning in *Cancio* implicated that the plaintiff omitted the testimony of one doctor in favor of introducing the testimony of another who was a " 'hired gun.' " *Id.* Griffin responds that these questions, when viewed in context, were properly raised.

¶ 83    Taking the questions defendant challenges out of order, we first reject defendant's claim that a question directed to Washington asking if he wanted the jury to believe Griffin was a racist was prejudicial. The trial court sustained the objection to this question, and we presume, absent clear evidence to the contrary, that any prejudice stemming from such question was cured. See *Garcia v. City of Chicago*, 229 Ill. App. 3d 315, 320-21 (1992). All other questions relating to the alleged racist remarks were asked in good faith as there was conflicting testimony regarding what transpired prior to Griffin's ejection from the bar.

¶ 84    Secondly, we reject defendant's contention that counsel improperly asked Tomares whether Mullen's cares about the safety of its customers because it depicted defendant as an uncaring, unsympathetic business. Defense counsel objected to this question as speculative. However, Tomares responded that he could not speak to whether defendant cared, but it was

clear that defendant chose to forgo additional measures for safety and security. We note that, in negligence cases, juries are asked to consider whether a defendant has exercised a reasonable standard of care. In this instance, the challenged question appears to draw attention to whether defendant's business practices exhibited a certain level of care and concern for the patron's safety. Thus, we do not find that the question itself was wholly inappropriate or that counsel's inquiry was in bad faith.

¶ 85    Lastly, defendant challenges questions posed to Washington about his personal history as a linebacker and whether he enjoyed hitting people. Defendant claims that these questions gave rise to innuendo and impermissibly suggested that Washington hit Griffin during the incident. Defendant cites cases where evidence of prior conduct was found inadmissible or irrelevant to the issues of the case. See *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359 (2011); *Belshaw v. Hillsboro Hotel, Inc.*, 229 Ill. App. 3d 480 (1992). In *Belshaw*, the court examined whether evidence regarding the plaintiff's propensity to fall was relevant to her contributory negligence in a slip-and-fall case. 229 Ill. App. 3d at 484. The court found that the plaintiff's prior falls had no legitimate tendency to prove that she should have taken extra precautions due to her propensity to fall and were improperly admitted. *Id.* at 485-86. Similarly in *Kruppe*, the court rejected evidence of prior nonpayment in a breach of contract case disputing nonpayment of fees. 409 Ill. App. 3d at 369. We disagree with defendant's characterization of this line of questioning as an improper use of propensity evidence to prove the actions Washington took that night.

¶ 86    There was no dispute that Washington did in fact use force to eject Griffin from the bar that night. The conflicting testimony centered on how much force was used and the impetus for the use of force. However, the main consideration before the jury was whether defendant

should have done more in hiring and training Washington to prevent incidents like this one. With this consideration in mind, we find that questions about Washington's temperament as exhibited by his history of playing football were not entirely baseless. Thus, the trial court did not abuse its discretion in allowing this line of questioning.

¶ 87                                    E. Jury Instruction

¶ 88        Defendant contends that the jury instructions on future pain and suffering and future loss of normal life were given erroneously. He argues that Griffin's lay testimony, alone, was insufficient to support any award because expert medical testimony is necessary to establish such damages. Defendant maintains that this was a reversible error and requests a new trial on these grounds. In the alternative, defendant requests remittitur in the amount of $145,000, which was awarded for future loss of normal life and future pain and suffering.

¶ 89        It is within the trial court's considerable discretion to give or deny a jury instruction. *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 121 (2003). In determining whether this discretion was abused, we will consider the instructions in their entirety and determine whether the jury was fairly, fully, and comprehensively informed as to the relevant legal principles. *Id.* at 122. Even where a trial court has given faulty instructions, a reviewing court ordinarily will not reverse unless the instructions clearly misled the jury and resulted in serious prejudice to the appellant. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002); *Bulger*, 345 Ill. App. 3d at 121.

¶ 90                                1. Expert Medical Testimony

¶ 91        The trial court has discretion to review the evidence presented and decide whether that evidence raised an issue which requires a particular jury instruction. *Stapleton v. Moore*, 403 Ill. App. 3d 147, 163 (2010). During the jury instructions conference, defendant's counsel

and the trial court disagreed over what evidence was required when giving a jury instruction on future pain and suffering under *Stift v. Lizzadro*, 362 Ill. App. 3d 1019 (2005). The trial court stated it found Griffin's testimony as to his limitations due to the injury was sufficient to warrant the jury instruction. The court explained its interpretation of the case law as follows:

> "if you have a soft tissue injury, such as a neck and back injury, and there's no demonstrable evidence of an injury, there's no x-ray, nothing of that nature, then you may need more than the plaintiff's own testimony. *** If there's an objective injury, which a fracture I think would be *** I think that's the type of injury then that the jury can take into consideration and evaluate."

Defendant responded that the analysis could not turn on the classification of a soft versus non-soft tissue injury and the court must consider whether the pain can be articulated and apparent to the jury at the time of testimony. Defendant argued that the medical testimony demonstrated that Griffin's injury was mostly healed and the doctor did not impose any permanent restrictions. Griffin also exhibited no apparent signs of pain during trial such as cradling his arm. Thus, defendant contends that the trial court erred in submitting an instruction for future pain and suffering to the jury on the basis of pain that was not readily observable.

¶ 92    *Maddox v. Rozek*, 265 Ill. App. 3d 1007, 1011 (1994), and *Stift* set forth the objective-subjective test allowing for lay testimony to establish a basis for a future pain and suffering instruction if "the ongoing pain and suffering would be readily apparent to a lay jury from the nature of the injury." *Stift*, 362 Ill. App. 3d at 1026. In both *Maddox* and *Stift* the plaintiffs were injured as a result of car accidents. *Id.* at 1021; *Maddox*, 265 Ill. App. 3d at 1008.

Neither plaintiff suffered any broken bones, and both plaintiffs complained of lingering pain in the soft tissue of the shoulders, back, or neck. *Stift*, 362 Ill. App. 3d at 1023; *Maddox*, 265 Ill. App. 3d at 1008. At trial, neither plaintiff displayed symptoms of pain that were readily apparent to the lay jury. *Stift*, 362 Ill. App. 3d at 1027; *Maddox*, 265 Ill. App. 3d at 1011. Thus, the court found in both cases that the plaintiff's testimony, without more, was insufficient to warrant a jury instruction on future pain and suffering. *Stift*, 362 Ill. App. 3d at 1027; *Maddox*, 265 Ill. App. 3d at 1011.

¶ 93    The court in *Maddox*, 265 Ill. App. 3d at 1009-10, cited cases to show examples of the types of injuries which would not require expert medical testimony. See, *e.g.*, *A.O. Smith Corp. v. Industrial Comm'n*, 69 Ill. 2d 240, 242, 245 (1977) (plaintiff's penis was crushed, causing loss of use of his testicles); *Burnett v. Caho*, 7 Ill. App. 3d 266, 270-72, 276 (1972) (plaintiff lost his eye and was given an artificial eye). In such cases, the juries could objectively determine permanency and related future pain and suffering from the nature of the injury alone. *Maddox*, 265 Ill. App. 3d at 1009-10. The court in *Stift*, 362 Ill. App. 3d at 1027, went one step further and gave an example of a case that would pass the objective-subjective test, despite the permanent nature of the injury being less readily apparent. See *Neyzelman v. Treitman*, 273 Ill. App. 3d 511, 518 (1995) (minor-plaintiff suffered post-traumatic stress syndrome after a car accident). The court in *Stift*, 362 Ill. App. 3d at 1027, noted that the injury in *Neyzelman* had "manifested itself in a permanent condition of stuttering," which was readily apparent to the jury and thus was sufficiently objective to warrant a jury instruction on future pain and suffering without medical testimony.

¶ 94    Thus, the test requires first looking at whether a jury could objectively determine permanency based on the nature of the injury alone. If the nature of the injury allows for an

objective determination of permanency, then no expert medical testimony is required, and in some cases, even the plaintiff's testimony is not required. However, if the nature of the injury does not allow for an objective determination of future pain and suffering, then either expert medical testimony is needed or lay testimony coupled with an objective manifestation of the injury's permanency or sustained pain and suffering.

¶ 95     Here, the trial court determined that a jury could objectively determine the permanency of the wrist fracture and its related pain and suffering without medical testimony and thus neither expert medical testimony regarding, nor an objective manifestation of, the injury's permanence was required at trial. We can find support for the trial court's determination that a bone fracture does not require expert testimony in *Ziencina v. County of Cook*, 188 Ill. 2d 1 (1999). Although our supreme court did not fully examine the question of whether expert medical testimony was required, it held that the nature of the injury and the plaintiff's testimony regarding his continued pain were sufficient to uphold the jury award. *Id.* at 16.

¶ 96     The plaintiff in *Ziencina* suffered, *inter alia*, rib fractures, bruised lungs, and was diagnosed with respiratory distress syndrome. *Id.* at 8. In the medical expert's deposition, she testified that the plaintiff's respiratory distress syndrome had resolved itself prior to discharge and most patients had few residual problems after recovery. *Id.* She further opined that it was conceivable for plaintiff to have continued pain, but she had not seen the plaintiff since his discharge and could not testify to the permanency of the injury. *Id.* The plaintiff and his wife testified that he continued to suffer, such that his work had been affected, he tired easily, and he found physical contact painful. *Id.* at 7, 16. The court, citing *A.O. Smith*, held that evidence regarding the nature of the plaintiff's injuries combined with his and his wife's testimony was sufficient grounds for the jury to base its award. *Id.* at 16 (citing *A.O. Smith*,

69 Ill. App. 2d at 245). *A.O. Smith*, was a case highlighted by *Maddox* as the type of injury from which permanency can be determined without expert medical testimony.

¶ 97    In this case, we have clear testimony that Griffin's scaphoid bone was fractured. Dr. Schildhorn, at the time of his deposition, had not recently examined Griffin's wrist and could not testify conclusively about the permanency of the injury. However, there was a possibility of continued complications. Griffin testified that he continued to suffer pain and restrictions in his daily life due to the injury. We see no reason for Griffin's wrist fracture to be treated differently than the plaintiff's rib fractures in *Ziencina*. Accordingly, we find that the trial court did not abuse its discretion in giving a jury instruction on future pain and suffering.

¶ 98    Defendant contends that a major difference between *Ziencina* and Griffin can be found in the length of hospitalization and complications which required surgery. However, we find that the nature of the injury, which is the determining factor of whether expert testimony is required, is the same here. A bone fracture, regardless of where it occurs in the body, is the type of injury that can be readily understood by laypersons on the jury, and the trial court correctly distinguished this case from *Maddox*, *Stift*, and *Neyzelman*.

¶ 99                                2. Remittitur

¶ 100    Defendant's claim for remittitur stems from its arguments that the jury was improperly instructed and that either a new jury trial or remittitur should be granted. Defendant does not address the applicable standard of review for granting a remittitur, and we have already found that the jury instruction was properly given. Consequently, we will not consider defendant's remittitur claim.

¶ 101                          F. Prior Criminal Convictions

¶ 102    During the motion *in limine* hearing on June 5, 2017, Griffin's counsel argued that he had only recently discovered Washington's criminal convictions in the state of Iowa and sought permission to introduce them during the trial. These convictions included charges for criminal mischief, disorderly conduct, assault, interference with an official, bribery, solicitation, and aggravated assault. Counsel referenced Washington's deposition testimony on September 8, 2015, during which he answered that he had never been convicted of a felony nor had he been convicted of a misdemeanor involving dishonesty and he declined to provide counsel, off the record, with his social security number.[7] Counsel pointed to Washington's actions as causing the delayed discovery and highlighted the impermissible perjury.

¶ 103    Griffin's counsel noted that the main purpose for bringing in the convictions, through the testimony of Griffin's expert witness, was to prove defendant's negligence in hiring a security guard with a criminal history. Counsel claimed that impeaching Washington would only be the secondary purpose of introducing the convictions. Defendant's counsel responded that the first stated purpose should be barred because it would constitute an Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) violation, given that Washington's social security number was provided years ago and it was counsel's failure to exercise due diligence that the expert witness had not received the information in a timely manner to prepare disclosures prior to trial. Furthermore, defendant's counsel argued against the admission of a number of the convictions based on their age and lack of relevance to Washington's credibility.

¶ 104    The court responded that Griffin was barred from introducing the convictions through his expert witness because it would result in a Rule 213(f) violation. However, if Washington

[7]Two case management orders entered on September 1 and September 9, 2015, required defendant to provide the last four digits of Washington's social security number or be barred from presenting Washington's testimony at trial.

denied his convictions on the witness stand, then he would be subject to impeachment because he had denied his convictions under oath and counsel had discovered his record. If Washington admitted his convictions, then the motion *in limine* was moot.

¶ 105    Defendant argues that the trial court violated Rule 609 of the Illinois Rules of Evidence (Ill. R. Evid. 609 (eff. Jan. 1, 2011)) in failing to bar the references to Washington's criminal convictions. Defendant further contends that Griffin violated the motion *in limine* limiting any use of Washington's prior criminal convictions to impeachment purposes. Defendant maintains that it was clearly prejudiced by the discussion of Washington's prior criminal convictions in the second trial as reflected by the jury's determination of Griffin's contributory negligence. Defendant asserts that the jury in the first trial, which did not hear the impermissible evidence, allocated 49% of fault for the incident to Griffin, whereas the second jury found Griffin was only 15% at fault.

¶ 106    First, we find that Rule 609 is inapplicable because Washington's criminal convictions were not introduced to attack his credibility as a witness. Rule 609 provides that impeachment by evidence of conviction of a crime is to "attack[ ] the credibility of a witness" (Ill. R. Evid. 609(a) (eff. Jan. 1, 2011)), yet here, the convictions were allegedly being brought in to show that Washington had previously perjured himself. Perjury is a different attack on credibility than the fact that the witness has prior convictions. Rule 609 was inapplicable, and the trial court did not err in failing to bar the convictions based on the categorical and time limits proscribed by Rule 609.

¶ 107    Next, we note that a violation of a motion *in limine* is not *per se* reversible error. *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1132 (2000). We consider whether the order is specific, the violation is clear, and the violation deprived defendant of a fair trial.

*Garden View, LLC v. Fletcher*, 394 Ill. App. 3d 577, 589 (2009). Here, the court's ruling specified that plaintiff's expert was barred from testifying about Washington's convictions in relation to defendant's negligence in failing to conduct a background check. The court also stated that the convictions could be used only if Washington was not honest about his convictions and needed to be impeached by showing his perjury. Defendant argues that, other witnesses, who testified before Washington, were asked about his convictions. Even if Washington had testified first, he admitted his convictions on the stand and there was no reason to impeach him.

¶ 108    We find that the court's ruling was inherently confusing where, in order to bring the convictions into evidence, Washington had to first deny his convictions when asked on the stand. To resolve this inconsistency, it is possible that the court may have considered that the convictions would be appropriately raised during trial and intended to rule only on the use of the deposition transcript in conjunction with the specifics of Washington's criminal record to prove perjury. At trial, Washington admitted he had been convicted of a felony and other misdemeanors on direct examination, yet Griffin's counsel brought in the issue of his perjury during discovery depositions and his specific convictions. Even so, the jury was already aware of the convictions and the fact that defendant did not conduct a background check to screen Washington. Proof of Washington's perjury affected his credibility, which was already called into question by his conflicting testimony, as well as the testimony of Heytow, Page, and other witnesses, and also Washington's inability to recall details about Griffin. The perjury and discussion of Washington's actual convictions did not change the fact that defendant did not conduct background checks or other forms of screening for potential employees. Thus, defendant cannot show that it was substantially prejudiced.

¶ 109     We also note that the court was never asked to consider whether other witnesses and defendant's expert could be questioned about the convictions. An *in limine* order always remains subject to reconsideration by the court during trial. *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 136 (1999). Failure to object to the evidence at trial forfeits the issue on appeal. *Id.* During the motion hearing, Griffin's counsel presented a "primary" and "secondary" reason for bringing in the convictions, first to show what the defendant, as the employer, should have known of the convictions and separately to impeach Washington. The court only considered whether the convictions could be used to show what the employer should have known in the context of plaintiff's expert testimony. We believe that the court's *in limine* ruling was unclear as to use of criminal convictions outside of testimony offered by plaintiff's expert.

¶ 110     The only reason the court offered for barring plaintiff's expert from testifying about the convictions was that it would violate rules about the timeliness of expert witness disclosures. The trial court did not comment on whether the convictions could be used to show what defendant should have known about Washington during the hiring process if raised in other contexts, such as through Ani or Hauri's testimony. Defendant did not object when Griffin's counsel questioned Ani,[8] Heytow, Page, and Hauri about Washington's convictions. Had defendant objected, the court could have addressed the remaining concerns not covered by the initial *in limine* ruling. Defendant's failure to object and permit the trial court an opportunity to clarify its order results in waiver of the issue on appeal.

¶ 111                          G. Griffin's Motion for New Trial

---

[8]Counsel did object when Ani was questioned about a hypothetical candidate with a history of domestic violence arrests, which was the subject of a separate motion *in limine*, and to an incomplete hypothetical.

¶ 112    Lastly, defendant contends that the trial court erroneously granted Griffin's motion for a new trial on January 17, 2017, where the only ground for reversal was Griffin's failure to abide by the Illinois Pattern Jury Instructions, Civil (2011) (hereinafter IPI Civil (2011)). Griffin responds, firstly, that defendant waived this claim because it failed to move for reconsideration or file an interlocutory appeal prior to the second trial. Furthermore, Griffin maintains that he correctly followed IPI Civil (2011) No. 30.05 and a new trial was warranted because the jury ignored the law, evidence, and common sense in awarding $0 for the pain and suffering experienced and reasonably certain to be experience as a result of the injuries.

¶ 113    Griffin first argues for waiver under section 2-1202 of the Code of Civil Procedure (735 ILCS 5/2-102 (West 2016)), which governs posttrial motions in a jury. However, he fails to cite a specific provision of section 2-1202 under which defendant's challenge to the order granting a new trial may be found forfeited. Griffin only cites *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶¶ 25-28, which discusses the difference between subsections (c) and (e) of section 2-1202 in comparison with section 2-1203. Presuming that Griffin intended to direct our attention to these subsections, the statute provides that:

"(c) Post-trial motions must be filed within 30 days after the entry of judgment or the discharge of the jury, if no verdict is reached, or within any further time the court may allow within the 30 days or any extensions thereof. A party against whom judgment is entered pursuant to post-trial motion shall have like time after the entry of the judgment within which to file a post-trial motion.

***

(e) Any party who fails to seek a new trial in his or her post-trial motion, either conditionally or unconditionally, as herein provided, waives the right to apply for a new trial, except in cases in which the jury has failed to reach a verdict." 735 ILCS 5/2-1202(c), (e) (West 2016).

¶ 114     Defendant contends that it did not have to preserve any error resulting from the trial court's order because it was not asking for a new trial, instead, defendant challenges the order entered on Griffin's posttrial motion. We agree that, under the plain language of the statute, subsection (e) is inapplicable here. See *Maschek v. City of Chicago*, 2015 IL App (1st) 150520, ¶ 44 ("If the statutory language is clear, we must apply it, without resort to any aids of statutory construction."). Similarly, the circumstances of this case do not come under the first half of section 2-1202(c). However, the latter half of section 2-1202(c) provides a 30-day window to challenge "judgment" entered on posttrial motions. See 735 ILCS 5/2-1202(c) (West 2016). Thus, we consider whether the order granting Griffin's motion for a new trial is a judgment. An entry of judgment is a term of art referring to the recording of a court's final decision. Black's Law Dictionary (10th ed. 2014). An order is final if it terminates the litigation between the parties on the merits or disposes of the rights of the parties on the entire controversy. *In re Marriage of Blanchard*, 305 Ill. App. 3d 348, 351 (1999). An order that leaves a cause still pending and undecided or leaves matters regarding the ultimate rights of the parties for future determination is not a final order. *In re Petition to Incorporate the Village of Greenwood*, 275 Ill. App. 3d 465, 470 (1995). Thus, an order granting a new trial is not considered an entry of judgment, and it would not trigger the latter half of section 2-1202(c). Accordingly, we find that defendant was not required to file an additional posttrial motion to avoid waiver. However, Griffin also maintains that waiver

applies due to defendant's failure to file an interlocutory appeal under Illinois Supreme Court Rule 306(a)(1) (eff. Mar. 8, 2016).

¶ 115    Defendant contends that it did not have to invoke Rule 306(a)(1) and petition this court for an interlocutory appeal. Defendant argues that interlocutory appeals are not final and relies on *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 240-41 (1986), and *Koenig v. National Super Markets, Inc.*, 231 Ill. App. 3d 665, 667 (1992), as support for its claim that nothing prevents appellate review of the interlocutory order after the entry of judgment in the second trial. However, we find that neither of these cases aids in our resolution of the issue presented.

¶ 116    Although there is little case law addressing the effect of failing to petition for an interlocutory appeal on a party's right to later challenge an order granting a new trial, we found two cases which inform our decision. In *Ford v. Narup*, 38 Ill. App. 2d 245, 246 (1962), the Fourth District found that the plaintiff, who elected to move forward with a new trial without first seeking review of the order granting the new trial, could not later challenge the order by seeking leave of the appellate court. The First District's statement in *Simmons v. Chicago Housing Authority*, 267 Ill. App. 3d 545, 554 (1994), echoes the court's sentiments in *Ford*. Although not dispositive of the issues on appeal, the court stated in dicta that failure to file a timely petition for leave to appeal from the trial court order granting the new trial resulted in waiver of the right to contest the order. *Id.* (citing *Feucht v. Clarke*, 299 Ill. App. 477 (1939)). We agree with these cases and find that defendant has waived any challenge to the trial court's order granting a new trial after it declined to file an interlocutory appeal. In proceeding to the second trial without objection, defendant has lost the right to raise a challenge against the order granting a new trial.

¶ 117       The question before us is different from the questions posed by the parties in the cases cited by defendant. In *Kemner*, the Illinois Supreme Court considered the propriety of a trial court order addressing a motion that had already been the subject of a denied petition for interlocutory appeal. 112 Ill. 2d at 241. In *Koening*, the appellate court considered the preclusive effect of its earlier denial of an interlocutory appeal on the party's ability to re-raise the issue on an appeal following a second trial. 231 Ill. App. 3d at 667. In this case, there was no attempt to petition for interlocutory appeal and therefore no denial and related questions of preclusion or other effect. We find that defendant's acquiescence to the order for new trial resulted in waiver and precludes defendant's challenge to the order in the present appeal. Thus, we do not reach defendant's claims of invited error and arguments regarding the pattern jury instructions and verdict forms.

¶ 118                                III. CONCLUSION

¶ 119       For the reasons stated, we affirm the circuit court's judgment.

¶ 120       Affirmed.